Peter M. SHONG, Plaintiff and Appellant,

v.

FARMERS' & MERCHANTS' STATE BANK, Inc., HUTCHINSON, MINNESOTA, a corporation; John A. Humbird, trustee; Hutchinson State Bank; R. L. Mackedanz; Ida Mackedanz; Mohall State Bank, a defunct banking corporation; Charles H. Pettis, also known as C. H. Pettis; Bertha Pettis; Ray Shong; Hans S. Rapp, administrator of the Estate of Alfreda Shong, deceased; the heirs of Alfreda Shong, deceased, namely, Grace Conway, Gladys Schmidt, also known as Mrs. Gordon Schmidt, Frances Shong, Franklin R. Shong, Hazel R. Shong, Alice B. Sulster, and Barton J. Westergren; and the County of Renville, North Dakota, a municipal corporation and a political subdivision of the State of North Dakota; and all other persons unknown claiming any estate or interest in or lien or encumbrance upon the property described in the Complaint, Defendants and Respondents.

No. 7494.

Supreme Court of North Dakota.

June 7, 1955.

910

Duane R. Nedrud, Minot, for plaintiff and appellant.

McGee & Van Sickle, Minot, for defendants and respondents.

JOHNSON, Judge.

This action comes to us for a trial de novo upon an appeal from a judgment of the district court of Renville County, North Dakota, decreeing that the plaintiff, Peter M. Shong, and the defendants, Gladys Schmidt, Grace Conway, Frances Shong, Franklin Shong, Hazel Shong, Barton J. Westergren, and Alice B. Sulster, the children of Alfreda Shong, deceased, are the owners as tenants in common of the South Half (S½) of Section 23, Township 163, Range 84, Renville County, North Dakota. This real property was purchased from Renville County under a contract for deed in the name of Peter Shong on the 15th day of January, 1942, and a county deed was issued to him on the 26th day of January, 1945. He brought an action to quiet title to the premises on the 21st day of March, 1952, claiming to be the absolute owner thereof. The answering defendant, Gladys Schmidt, claims that he holds the title in trust.

If the facts in this action warrant the determination that the plaintiff holds title to the premises for himself and his brothers and sisters, the trust arises by implication and would be in the nature of a resulting trust.

The trial court decided the issues between the parties apparently on the theory of an implied trust. An implied trust is one which is created by operation of law. Section 59-0105, NDRC 1943.

"Implied Trust; How Created. An implied trust arises in the following cases: [subsections 1, 2 and 3 not applicable under the facts]

"4. When a transfer of real property is made to one person and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made." Section 59-0106, NDRC 1943.

A trust in land created by operation of law may be established by parol evidence. Fox v. Fox, 56 N.D. 899, 219 N.W. 784. Parol evidence is admissible to prove an implied trust resulting from payment or ownership of the purchase money for the conveyance to another and to show that the consideration paid belonged to the person claiming the trust. 65 C.J. 385 et seq.; 89 C.J.S., Trusts, § 116; Sheffield Milling Co. v. Heitzman, 192 Iowa 1288, 184 N.W. 631.

Such trust does not depend upon contract, but arises by operation of law and is not affected by the statute of frauds. Redman v. Biewer, 78 N.D. 120, 48 N.W.2d 372.

The record in this case reveals that Alfreda Shong was married twice. Her first husband was Michael H. Conway. Peter M. Shong and Grace Conway, Alice B. Sulster and Barton J. Westergren are children of the first marriage of Alfreda Shong. One son of the first marriage of Alfreda Shong was killed in the war. The testimony is silent as to what war, but it must have been World War II. None of the children of the first marriage ever lived on the premises involved in this action except Peter M. Shong, the plaintiff. Sometime in the 1920's, Alfreda Conway married Ray Shong. On March 6, 1931, under a land sale contract, Ray Shong and Alfreda Shong, his wife, purchased the premises involved in this action from the Farmers' and Merchants' State Bank of Hutchinson, Minnesota, for the sum of $5,000.

It appears that four children were born of the marriage of Ray Shong and Alfreda Shong, to wit: Gladys Schmidt, also known as Mrs. Gordon Schmidt; Frances Shong, Hazel Shong and Franklin Shong. About 1936, Ray Shong abandoned and deserted his family. The address of Ray Shong is unknown. The evidence does not show whether he is dead or alive. The taxes on the premises were not paid and Renville County acquired title thereto for nonpayment of taxes on the 10th day of April, 1940. At that time Peter M. Shong, the plaintiff, a child of the first marriage of Alfreda Shong, was about twenty years of age and the other children were between twelve and seventeen years old.

The dispute in the evidence in this action centers around a disagreement as to whether the plaintiff paid for the premises or whether the $2,000 paid therefor was made to Renville County by the combined efforts of Alfreda Shong, now deceased, and Peter M. Shong. It also involves the question of whether the premises were purchased by Alfreda Shong, not only for Peter M. Shong, but for his half brother and sisters, already mentioned, or whether they were purchased by Alfreda Shong for all of her children, both of the first and the second marriage.

Peter M. Shong testified that he had two full sisters and two full brothers, one of whom was killed in the war. The record does not disclose the whereabouts of Grace Conway. The address of Alice B. Sulster, as shown by the record, is Solvang, California. But the record does show that except for Peter M. Shong, the children of the first marriage of Alfreda Shong did not live on the premises which are the subject of this action at any time after the purchase thereof in the name of Peter M. Shong from Renville County, North Dakota, nor did they in any way contribute to the common effort of Peter M. Shong and his half brother and sisters, and Alfreda Shong in maintaining the family and keeping it together on this farm.

There are two types of implied trusts, constructive and resulting. Section 59-0106, NDRC 1943. If a trust is involved here, it is a resulting trust.

The existence of a resulting trust depends upon the acts or expressions of the parties indicating an intent that a trust relation result from their transaction. For a discussion of resulting trusts see Volume 29, North Dakota Law Review, pages 75-80.

The courts are reluctant to ingraft a trust by parol on the legal title to real estate; and there is perhaps no better established doctrine than the one which requires a high degree of proof in order to establish the trust by parol evidence. 23 A.L.R. 1500, 1502 and cases cited; Carter v. Carter, 14 N.D. 66, 103 N.W. 425; Holler v. Amodt, 31 N.D. 11, 153 N.W. 465; Bernauer v. McCaull-Webster Elevator Co., 41 N.D. 561, 171 N.W. 282. These cases hold that the proof of an implied or resulting trust must be clear, specific, substantial, and satisfactory.

Whether a trust has been created is primarily a question of intention. Reel v.

Hansboro State Bank, 52 N.D. 182, 201 N.W. 861.

The issue in this case is whether or not an implied or resulting trust has arisen under the facts and circumstances. The intent of the parties is to be gathered from the evidence of their actions and expressions at the time of the purchase of the property from Renville County in the name of Peter Shong, and their actions and expressions subsequent thereto. It has been held that where the issue is whether the settler intended to set up a trust in his own favor or to make a settlement on another, his declarations, either before or at the time of the transactions in question, are admissible to prove his intention in the matter. Smithsonian Institution v. Meech, 169 U.S. 398, 18 S.Ct. 396, 42 L.Ed. 793.

Here we have the difficult situation that the mother of the contending parties is deceased. Her testimony is no longer available to show her intent at the time the property was purchased.

The rule has been laid down that if a father or parent pays the consideration and has the conveyance run to his child, there is a rebuttable presumption of a gift. Volume 2A, Bogert, Trusts and Trustees, Section 460, page 494. Most decisions treat the cases in which the mother is the payor and the child is the grantee in the same way as where the father pays the purchase price. Volume 2A, Bogert, Trusts and Trustees, Section 460, page 498.

The facts aside from the source of payment and the form of the deed are important by way of rebutting or corroborating the finding of a gift intent. The health, age, financial condition and the business experience of the mother are to be considered in determining the issue. It would be exceedingly natural for a wealthy mother to make a gift of part of her property to her child. The opposite, however, is true if the mother has little. See Volume 2A, Bogert, Trusts and Trustees, Section 460, page 500.

Here the facts show that the mother was concerned about keeping her family together; that is, Peter M. Shong, the oldest of her children, and the four younger children born of her marriage to Ray Shong. The facts further show that Ray Shong had abandoned the mother and these children and left her as their sole support. The children, except for Peter Shong, were in their early or late teens. They were in need of guidance, supervision, and support. There is no evidence in the record to support the contention that Alfreda Shong intended to, or did prefer one to the others. There is no evidence indicating that the purchase of the land constituted a preference of Peter M. Shong over the other children who were living with the mother at the time. If any presumption is to be indulged in, it would be that Alfreda Shong was purchasing the property involved for all of the children at home.

The forfeiture of the property for taxes clearly indicates that the Shong family was hard pressed financially. The evidence indicates that the effort of Alfreda Shong, her oldest son Peter, and the other children was necessary in order to sustain the family. Their combined efforts as a family unit were needed in the lean years.

Alfreda Shong was taken sick in the fall of 1947 and died in March of 1948. The first difficulty here encountered is to determine whether or not statements made by her at the time of the purchase of the property involved in this action are admissible in evidence.

"In any civil action or proceeding by or against executors, administrators, heirs at law, or next of kin in which judgment may be rendered or ordered entered for or against them, neither party, except as provided in section 31–0104 and section 31–0105, shall be allowed to testify against the other as to any transaction whatever with or statement by the testator or intestate, unless called to testify thereto by the opposite party. * * *" Section 31–0103, NDRC 1943.

The trial court admitted statements in evidence of Alfreda Shong at the time and

subsequent to the purchase of the property. Objections were made to such testimony under the provisions of this statute. This court has consistently refused to extend the statute by interpretation and has confined its application to the letter thereof. St. John v. Lofland, 5 N.D. 140, 64 N.W. 930; First National Bank v. Warner, 17 N.D. 76, 114 N.W. 1085, 17 Ann.Cas. 213; Keller v. Reichert, 49 N.D. 74, 189 N.W. 690; Miller v. First National Bank, 62 N. D. 122, 242 N.W. 124. See also Wigmore on Evidence, 3d Ed., Sec. 578; Gange v. Gange, N.D., 56 N.W.2d 688.

 The title to this action would make it appear to be a civil proceeding by or against an administrator and the heirs at law of a deceased. But, is it an action in which a judgment is rendered or ordered entered for or against them within the meaning of this statute? In order to determine that question, it is necessary to analyze the actual situation.

This is an equitable action to quiet title to real property. The plaintiff claims under an absolute deed. The answering defendant, Gladys Schmidt, also known as Mrs. Gordon Schmidt, claims that the plaintiff holds the premises in trust. The administrator of the estate of Alfreda Shong, Hans S. Rapp, who was named as a party defendant, did not answer in the action. There is no assertion by him that the land involved belongs to the estate of Alfreda Shong, deceased. The property was not inventoried in the estate. Peter M. Shong does not claim the property involved in this case as a part of the estate of Alfreda Shong, deceased. Neither do the contending parties assert their rights as heirs of Alfreda Shong, deceased. The half brother and three half sisters of the plaintiff, heretofore mentioned, made a demand upon the plaintiff soon after the death of their mother that Peter divide up the premises with them.

If the defendant, Gladys Schmidt, and her brother and sisters mentioned are the recipients of a resulting trust, it is only on the theory that they have had an interest in the property since its purchase in the fall of 1941; that Alfreda Shong purchased the property for them in the name of Peter Shong; that Peter and his half brother and sisters were to share it equally. The issue between the parties here is whether the deed of Peter Shong, also known as Peter M. Shong, is an absolute conveyance or whether it is to be impressed with a resulting trust by a court of equity for the purpose of carrying out the intent of Alfreda Shong at the time of the purchase of the land, and the agreement and understanding, express or implied, between the parties. Peter Shong contends that his deed gives him full ownership of the property. He claims that he paid for it. His half brother and sisters on the other hand, contend that the deed he holds is not what it purports to be; that he did not pay for the property; that they have a beneficial interest therein; and that Peter Shong is a trustee of their beneficial interest.

The case of Heuer v. Heuer, 64 N.D. 497, 253 N.W. 856, 859, was an action to quiet title as against a mortgage. William Heuer was the son of Carl Heuer. In 1910 Carl Heuer bought the land in question. William Heuer, the son, married in 1912, lived with his father, Carl Heuer, one year and then moved on the land which was the subject of the action. He lived continually on the land up to the trial of the action in 1933. He paid the taxes and kept the place in repair. He made some improvements. He and his wife created a home for themselves and their family of eleven children. The title stood in the name of Carl Heuer, the father. William Heuer, the son, made no accounting to his father for rents and profits. When he went upon the land there was a mortgage against it of $2,800. He paid the interest thereon annually until 1919, when his father discharged the mortgage. That year Carl Heuer bought another piece of land. He borrowed money from his brother, Henry Heuer, the defendant in the action. In 1929 at the request of Henry Heuer, Carl Heuer executed a note for the amount of the loan then remaining unpaid, and secured this note by a mortgage on the land which had been the original security, and on the

quarter section on which William Heuer lived. The action was brought to quiet title against that mortgage. Under these facts, William Heuer, the plaintiff, sought to establish the intention to make a present or gift by evidence and statements of Carl Heuer to him at the time of the making of the alleged gift and thereafter. The opinion written by Judge Nuessle says:

"Since Carl Heuer was deceased, the defendant objected on the ground that the statements made by him to the plaintiff were inadmissible under section 7871 C.L.1913, providing that in a civil action or proceeding by or against executors, administrators, heirs at law or next of kin in which judgment may be rendered or ordered entered for or against them, neither party shall be allowed to testify against the other as to any transaction whatever with or statement by the testator or intestate, unless called to testify thereto by the opposite party. The evidence was admissible as against this objection. As is said in Mowry v. Gold Stabeck Co. 48 N.D. 764, 186 N.W. 865, 866: 'The statute, precluding testimony concerning transactions had with deceased persons, is specific in its character, and relates only to actions wherein the personal representative, heirs, or next of kin are parties. * * * The plaintiff did not appear in that capacity; he claims title through a deed made by his father during his lifetime. The statute cannot be extended by judicial construction beyond this plain application.' "

The case of McDonald v. Miller, 73 N.D. 474, 16 N.W.2d 270, 274, 156 A.L.R. 1328, involved a constructive trust. In that case the facts disclose that prior to 1910 Alexander McDonald and his wife, both of whom were deceased at the time of the action, resided on the land which was involved in the action. The title thereto was in Alexander McDonald. His wife owned a quarter section adjacent. W. J. McDonald and Mae McDonald Miller were their only children. In 1910 the plaintiff married and brought his bride to the farm,

which was the subject of the action. In 1911 the father, Alexander McDonald, and his wife and their daughter Mae, left the farm and moved to Gardner. Later they moved to Fargo where they acquired a house in which the McDonalds lived until their death. Their daughter Mae lived with them and cared for them in their last illness. The house in Fargo was deeded to Mae. In 1934 Mrs. Alexander McDonald deeded the quarter of land that she owned to Mae. After the death of his wife, Alexander McDonald, on October 2, 1935, executed a deed to the land which was the subject of the action, to Mae McDonald Miller as grantee, which he left with one Frank Scott, president of the Merchant's National Bank and Trust Company of Fargo, with instructions to deliver the deed to the grantee after his death. Alexander McDonald died on May 19, 1939, and shortly thereafter the deed was delivered to the grantee. It was recorded January 11, 1940. The plaintiff, W. J. McDonald, sought to impress the Northwest Quarter, Section 10–142–50, which was the land involved in the action, with a constructive trust of which he claimed to be the beneficiary. Under these circumstances the question arose as to whether or not Section 7871 of the North Dakota Compiled Laws of 1913 was applicable, which is now partly embodied in Section 31–0103, NDRC 1943. The appellant, Mae McDonald Miller, also known as Mae Olson, sought to testify that she never agreed with her father to convey the land in question to the plaintiff and that no conditions were attached to the deed when it was given to her. The objection to her testimony was sustained on the ground that it related to a transaction between a deceased person and a party to the action and was inadmissible under the statute just mentioned. In that case, Chief Justice Morris, speaking for the court, said:

"The statute in question has no application to this action. The action involves no property of the estate of Alexander McDonald. While it is a suit between his son and daughter, neither appears in this action in the

capacity of executor, administrator, personal representative, or heir. The subject matter of the action is a quarter section of land, the title to which passed from the deceased prior to his death. The issue between the parties is whether the deed is an absolute conveyance or whether it will be impressed with a trust by a court of equity for the purpose of carrying out an agreement or understanding, expressed or implied, between the grantor and the grantee for the benefit of the plaintiff.

"Neither of the parties appears in this action in any capacity that brings them within the statute. It was error for the trial court to exclude the appellant's proffered testimony on the ground that it came within and was prohibited by the statute."

In the case at bar it is true that the title thereto designates the contending parties as the heirs of Alfreda Shong, deceased. But they are not claiming any interest in the property as her heirs. This action involves no property of the estate of Alfreda Shong. Under the facts and circumstances of this case, the rule announced in the Heuer and McDonald cases is applicable. The facts show that the parties do not come within the terms of Section 31-0103, NDRC 1943.

Since the half section, which is the subject matter of this action, does not constitute property of the Alfreda Shong estate, the trial court properly admitted the statements related by Frances Shong, Gladys Schmidt and Franklin R. Shong, to show the intent and the agreement and understanding between the mother and the five children at home at the time of. the negotiations and the purchase of the property from Renville County.

The defendants, Gladys Schmidt, also known as Mrs. Gordon Schmidt, Frances Shong, Hazel Shong, and Franklin R. Shong, although designated in the title of this action as the heirs of Alfreda Shong, are not claiming interest in the property as her heirs. They are claiming that Peter Shong holds their interest in the property in trust for them. They no doubt were made parties to this action because they had made a demand upon him for their interest therein. It is not clear why the administrator of the estate of Alfreda Shong was made a party to the action. He apparently felt that the property did not belong to her estate as he did not answer or make any claim thereto.

The evidence of the intent, agreement and understanding of the parties at the time of the purchase of this property from Renville County and subsequent thereto, we believe, may best be set forth in answer to specific questions to bring out the issue:

"1. Who paid for the property?

"2. Why was the property purchased in the name of Peter Shong, also known as Peter M. Shong?

"3. Was it the intention of Alfreda Shong that Peter Shong hold the title in trust for himself and his half brother and sisters living with Alfreda Shong at the time of the purchase, or was it her intent to buy the property in the name of Peter Shong for all of her children, both those of the first and second marriage, as determined by the trial court?"

The trial court found, as one of the ultimate facts involved, that in the summer of 1941, Alfreda Shong, the mother, called a family gathering consisting of herself, Peter M. Shong, and his half brother and half sisters, Franklin Shong, Gladys Schmidt, Frances Shong and Hazel Shong; that at that time the question was brought up whether they should leave the premises or repurchase it from the county and stay thereon; that it was agreed that Alfreda Shong, the mother of these five children, should contact the Renville County Commissioners regarding repurchase; and that at a later family gathering it was agreed that the premises should be repurchased in the name of the plaintiff. The trial court further found as an ultimate fact that the title to the premises was not taken in the mother's name because she believed she could avoid being assessed for back taxes,

and that her husband, Ray Shong, would be unable to claim any interest in the premises if he should return; that the title to the premises was taken in the name of the plaintiff, Peter M. Shong, because his mother, Alfreda Shong, thought that the vendee had to be of the age of twenty-one; that Peter M. Shong was the only child at home over that age; that the title was put in his name with the understanding that he would hold title to the premises for "all the children". The family group at the time consisted of Alfreda Shong, the plaintiff and the four children born of the marriage of Ray Shong and Alfreda Shong. We believe that "all the children" as used in the findings, is subject to the construction that the only ones to share in the property were those children living with Alfreda Shong at the time of the purchase. The other children of the first marriage, except Peter Shong, were not at home. There is no evidence in the record to show that they in any way contributed to the common effort to purchase the farm, or pay for it. The evidence further shows that the residence of Grace Conway is unknown, that Alice B. Sulster lives in California, that Barton J. Westergren was adopted out when he was a mere child, and that one full brother of Peter M. Shong was killed in the war, presumably World War II.

The trial court also found that the initial money paid on the contract for deed entered into between Renville County, North Dakota, and Peter M. Shong, was made by Alfreda Shong; that she paid the purchase price for the premises with the exception of $500, which was paid by the plaintiff.

The trial court found that Alfreda Shong had full control and management of the premises and the income therefrom from 1941 until her death; that she handled all of the money and did all of the actual buying and selling. It further found that at various times during the period between 1941 and 1946, reference was made to the fact that the plaintiff held the premises for the benefit of "all the children", which, as has been previously stated, under the evidence, would seem to indicate the children living with the mother at the time.

The findings of the trial court are entitled to appreciable weight. Braaten v. Brenna, N.D., 63 N.W.2d 302; Gunsch v. Gunsch, N.D., 67 N.W.2d 311.

Ray Shong and Alfreda Shong, Peter Shong and the four children born to Ray Shong and Alfreda Shong, lived on the premises at the time Ray Shong abandoned the family sometime in 1936.

As this court has many times noted, the early '30s were depression years, not only in North Dakota, but in the nation generally. The property involved in this action was lost for nonpayment of taxes to Renville County. After the county acquired title, Alfreda Shong leased the premises. When economic conditions began to improve, thought was given to the possible purchase of the land from the county. Alfreda Shong talked to the county commissioners about that matter. One of the county commissioners at that time was a man by the name of Judd Peterman. He testified that Mrs. Shong came to the commissioners and that she was there when the negotiations were going on for the repurchase. He did not recall what she said, but he did remember that there was talk to "buy the place back." The premises had been appraised for $2,000. He testified that it was the thought of the commissioners that it was well to keep the family together. He knew the land. It was not considered a "good farm". It was grazing and hay land with only a small portion of cultivated land, consisting of 60 acres. Arrangements were made to purchase the property from the county in the fall of 1941 and an option payment was made for the property on the 5th day of September, 1941, as per receipt of the County Treasurer which is in evidence. This receipt was issued to Peter M. Shong for $200 and states: "Option good to Nov. 1, 1941, on S½ 23–163–84." On the left hand side of the receipt is the abbreviation "ck" and the County Treasure testified that this would indicate that it was paid by check. The plaintiff testified he made all payments in cash. Frances Shong, who was with her mother at the time, states that she saw her mother make this payment of $200. At the time that Ray Shong left his family

the testimony shows that there were about fifteen head of cattle on the farm. At the time of the mother's death there were forty to forty-five head of cattle left. Sales were made from time to time of cattle over the years. Frances Shong states that she knew that her mother got the money to make the option payment from the sale of cattle. In addition to this evidence, there is a strong inference that the testimony of Frances Shong is correct. The record shows that on the next day after the option receipt, dated September 5, 1941, the County Treasurer banked a check for $182.48 from the Farmers Union Livestock Commission to Mrs. Shong. There is nothing in the evidence to indicate that she or anyone else of the Shong family paid any other money to the county on September 5, 1941, than the $200. The deposit record of the County Treasurer is dated September 6. We feel that the evidence is such that the $200 option payment was made by Alfreda Shong.

Peter Shong says that he paid $500 on the contract for deed. The trial court took his statement in that connection as true and granted him a lien on the premises for $500 plus some taxes that he claims he paid, the receipts for which are in his name.

The evidence of the parties, including that of the plaintiff, amply supports the conclusion that Alfreda Shong took the proceeds from the cattle, including all of the sales of livestock; and all of the cream sales. The documentary evidence shows that there were found among her papers a great many check stubs of various creamery concerns and these are in evidence. They show that the cream was all sold in the name of Mrs. A. Shong. In fact that is not disputed. In addition to that there are several exhibits in the evidence showing the sale of the livestock. The livestock was sold to various purchasers, among them Judd Peterman, who testified to her negotiations for the land with the county commissioners. The cattle were sold in the name of Mrs. Ray Shong, Mrs. R. Shong, or Mrs. Alfreda Shong.

Under the contract for deed between the plaintiff and Renville County, $500 was paid down, which must have included the option payment of $200, and the balance was payable in three annual installments of $500 each due respectively December 30, 1942, December 30, 1943, and December 30, 1944. Deed was issued to Peter Shong on the 26th day of January, 1945, by Renville County. On August 11, 1943, the County Treasurer issued a receipt which recites: "Received of Peter Shong, by Mrs. Shong, Five hundred forty-seven & 23/100 dollars, first payment (1942) on SE-SW 23–163–84 (contract for deed)". This receipt is signed by K. I. Sharp, County Treasurer. Also in the evidence appears a receipt dated January 15, 1945, which recites: "Received of Mrs. A. Shong, Sherwood, Five hundred twenty & no/100 dollars for Bal. in full payment of contract for deed on S½–23–163–84. Principal $500.-00, Int. $20.00", signed by K. I. Sharp, County Treasurer. Franklin Shong testified that in 1944, although he was not certain of the year, his mother gave Peter money for payment of the land.

This evidence of payment is supported by the oral testimony of Frances Shong and Gladys Schmidt that their mother made the payments on the land; that they knew that she had made them because the mother said so. So says Franklin Shong. While the plaintiff claims that he made all the payments required by the contract for deed, he admits that the income from the livestock was handled entirely by his mother. He was asked:

"Q. Well, now, do you have any evidence of payment at all of this money? A. Well, no, I haven't. I thought at that time I had receipts to show that. I haven't. I couldn't locate them. These two receipts you have here, I was with my mother at the time them receipts were made."

The receipts that he mentions must be the ones that have just been set forth. If, as Peter Shong contends, he made all the payments on the land and was with his mother when the two receipts in evidence were issued, and if he furnished the money, as he contends, was there any reason why he

should not have insisted that the receipts be issued in his name? He claims that his mother never gave him any money, but he admits that she kept all of the cream funds. He admits that all the money that came in from the farm, from the proceeds of the sale of cattle and dairy products, she kept; that she had the handling of that. At one time Peter Shong claimed that he got a share of the crop, but later qualified that by saying "but not always". He was unable to state the amount of crop raised on the sixty acres of cultivated land. At one point he admitted that the crops raised on the farm were not worth quarreling about. At another point he stated that it never amounted to over $500 in any one year. Some years it didn't even amount to $100. There is no evidence which shows whether these proceeds were gross or net. Many implications of the testimony of the plaintiff himself indicate that the payments for the farm came from Alfreda Shong. He admits that his mother raised the family from the time Ray Shong left. He started working out for the City Motor Company of Sherwood when he was twenty years of age.

Although Peter Shong asserts that he took the responsibility of supporting the family, his testimony has no support in the evidence. He did, with the others, help at times with the work of putting up hay and taking care of the cattle. But the evidence is clear that he neither managed the farm, nor supported the family. From 1940 the evidence indicates that he worked for others nearly all of the time. He purchased a car for himself and a tractor. These were his. When he was not working, he helped on the farm. But he admits that between 1941 and 1946 that he did not directly manage the farm. He puts it this way: "Indirectly I did. I worked out and exchanged work with some farmer and he in return either let me use his machinery or come and help put in this crop and take it off." The evidence shows that the younger children, ages twelve to seventeen at the time of the purchase of the farm, all worked together with their mother on the farm. They helped during haying; they milked the cows and did any number of other chores that must be done on a farm. It is common knowledge that children from twelve to seventeen, living on a dairy and cattle farm, can do, and do, a great deal of work. As the children grew older they did more work. These people were up against the necessity of supporting themselves, and it is common knowledge that on a farm, when necessity demands it, even young children contribute a lot of work toward the maintenance of the farm unit and the care of livestock. In later years Franklin Shong took charge to a greater extent than Peter.

Peter Shong also testified that the money he received from his work "in one sense" was his. He relates that his mother loaned him $150 to make payment on the land when he was short. When he was asked whether he had paid it back: "It's evidently been paid back, yes." At another point he admitted that the funds were all handled by his mother. He said: "Mother didn't trust me with the funds."

The plaintiff claims that he was with his mother when the deal was closed for the purchase of the land. He claims that he made the payment at that time. This is contradicted by the testimony of his sister, and the documentary evidence indicates that she was right. The plaintiff also claims that he made all of his payments out of his money and when asked:

> "Q. Where did you keep your money? A. I kept it at home whenever I had any to keep. I didn't start a banking account at that time."

He established a banking account in 1948. He made no payments on the land either by check, money order, or cashier's check. His evidence that it was all paid by him by cash, in face of the testimony of his half sister and half brother, and the documentary evidence already referred to, cannot stand and the trial court did not believe his statements.

Tax receipts for 1943 and 1944 were issued in the name of Mrs. A. Shong. A tax receipt for 1946 was issued to "P. and F. Shong", apparently having reference to

Peter and Franklin Shong. On the 1946 tax receipt appears, underneath the word *personal,* "Mrs. A. Shong." This would appear to have reference to the payment of personal property taxes listed thereon.

The trial court, however, decided that the evidence showed that Peter Shong had paid $500 on the premises and real estate taxes for the years 1942, 1945 and 1946, and granted him a lien on the premises for reimbursement of these sums which in the judgment is stated as $652.30.

We now come to the evidence relating to the reasons for purchasing the property in the name of Peter Shong, also known as Peter M. Shong. As far as the record discloses, Alfreda Shong and Ray Shong were never divorced, nor were they legally separated. It is very apparent that Alfreda Shong was anxious to keep her family together. She was also anxious to obtain a home for them. She apparently did not want her faithless husband ever to acquire any interest in any property that might be purchased. When the negotiations started for the purchase of the farm, it appears that somehow or other Alfreda Shong was informed, and came to believe, that if the property was purchased in her name, the county would be able to collect the back taxes. The record does not show how or from whom this information was obtained. But it is apparent that Alfreda Shong was of that impression. She obtained the information that if the property was purchased in her name, her husband, Ray Shong, being her heir, if he survived her, would have an interest in the property. It is upon this background that she called her family together in August 1941, and conversations took place between her and her five children living with her on the farm. All of the children, according to the testimony, were present. At that time Alfreda Shong informed her children that she had intentions of buying the farm and she asked the children whether they would rather buy the farm and continue to live together or pick up and leave the place and find another. It was determined that the farm be purchased. All parties apparently were in total accord in that connection.

Peter Shong was the only one of the children of the age of twenty-one and it was decided that the property be purchased in his name. Another family gathering took place in September of the same year, or later that year. It must have been after the time the option was obtained from the county. All of the five children mentioned and Alfreda Shong were present. At that time Frances Shong says her mother, in the presence of all the children mentioned, said to Peter Shong:

> "Just because this farm is in your name, don't get the idea you own it. This property is as much Gladys', Hazel's, Frank's and Frances' as yourself, remember that."

Gladys Schmidt and Frances Shong gave much the same testimony. Peter Shong gives his version of the August, 1941, conversation. He relates that his mother had met with the board of county commissioners; that they had offered her "a deal"; that they had informed her that she had a first chance to buy the place and that she could have gotten title thereto; that she didn't want the responsibility of buying the place; that she was disgusted; that she was not interested in having a home and that she didn't want to buy. He also relates that she told him that he could go ahead and purchase the place, or if he didn't buy it, to find a place that she could rent. It must be remembered that at the time of this conversation, the farm was leased by Mrs. Shong from Renville County. In this connection it is also well to remember that if it was the intent of Alfreda Shong, as indicated, to buy the property for the children, there was no reason why she should buy it for one of them in preference to the others, as she knew that Peter Shong was twenty-one years of age and capable of supporting himself. It would be very logical to presume that she wanted a home for the younger children. They were still in school, although they were capable of doing a lot of chores on the farm, as all farm children ordinarily have to do, they were not of the age where they were self-supporting. They still needed the care and the guidance of their mother. The evidence

presented shows a reason for purchasing the farm in the name of the oldest son. The evidence shows he did not contribute or pay the major portion of the purchase price thereof. His evidence that he did is not only inconclusive, but in many respects not credible and the trial court apparently did not give credence thereto. He had no support for his statements. His evidence is often conflicting and evasive. On the other hand, the evidence of the defendant, Gladys Schmidt, and her sister and brother corroborates the documentary evidence available.

The evidence further shows that there were several conversations concerning the land. They shed more light on the intent of Alfreda Shong. One such conversation took place between January and February of 1943, at which time the matter of the title to the farm was brought up, and Alfreda Shong remarked to Peter Shong again, that while the place was in his name, as Frances related the incident, "it belonged to the rest of us kids, as well, to the rest of us and for him to remember that."

Then again after the death of the mother there is no question that the children gathered in a hotel room at Minot. They were all present except Hazel Shong, a paralyzed sister. A request or a demand was made upon Peter to make a settlement with them on the farm. The evidence of Frances Shong shows the following in that connection:

"Q. And tell what conversation took place at that time. A. At that time we asked Pete if he was willing to make a settlement with us on the farm, and he said, 'The farm is in my name.' And we told him then that we figured we had a settlement coming. He says, 'As far as I am concerned, there is enough there for one person, and I don't see where there is anything to be split up with you.' * * * and at that time he also said, 'If there was anything there worth while so we could each get something out of it, sure, that would be fine to split it with you then.' "

Later at the same conference, Frances Shong testified as to the conversation:

"Q. Did he ever offer at any time in the event it were sold to give you a share of it, that you can recall? A. Well, the only offer he made was the time I am telling, 'If there is anything here for us to split, you will get your share.' "

With reference to this same conversation as related by Frances Shong, Peter Shong said:

"Q. * * * And did you—was there any conversation at that time or did any of them say anything to you about their claiming any portion of this property? A. No, they never mentioned it at that time.

"Q. Did they mention it at any time after that? A. They talked about it once after that. They figured they had something coming out of the place.

"Q. And when was that? A. Oh, probably the following week or possibly a week later.

"Q. And what did you reply to that? A. I said I didn't hardly see that they had anything coming, they had a home while they were there, they didn't contribute anything."

We will next consider whether it was the intention of Alfreda Shong that Peter Shong hold the title for himself and in trust for his half brother and sisters living with her at the time of the purchase, or whether it was her intent to buy the property in Peter's name for all her children, both those of the first and second marriage, as determined by the trial court.

Upon the abandonment of the family by Ray Shong, Alfreda Shong, with the aid and assistance of the children, became solely responsible for their support. The children of the first marriage of Alfreda Shong to Michael H. Conway, her first husband, except Peter, were all gone. They were not members of the family group. They were evidently self-supporting or adopted, as in the case of Barton J. Westergren. Her concern, therefore, was to enable her to meet her responsibility as a mother and raise her children to maturity. She, together

with Peter, and the assistance of the four younger children, did all the work on the farm, except such as was hired to help put in the small acreage of agricultural land. It was incumbent upon her and the younger children to do the milking, the chores of feeding and looking after the cattle, the household work, and other innumerable chores that arise in connection with the operation of a dairy and cattle farm. It was the assistance of Peter and the other four children that enabled her to raise cattle for income, which was used for the support of all the family and for payments of doctor bills for Hazel after 1944, and to make payments on the purchase of the land. The testimony of Gladys Schmidt, Frances Shong and Franklin R. Shong, indicates clearly that the purchase of the farm was not only for Peter's benefit, but for the benefit of the other four children as well. This has already been set forth.

Franklin Shong's testimony not only corroborates the testimony of his sisters that the farm was purchased by their mother with her money, but he positively testified that he knew she made the payments as "I heard them talking about it." He also testified positively that Peter agreed with the rest that the place did not belong to him. He was present at the meeting of Peter, Gladys and Frances in Minot shortly after his mother's death when there was talk about the farm and in that connection he was asked:

"Now, will you state what admission he made at that time and place and in the presence of these parties? A. My half-brother had made a statement in front of my two sisters and I, that the place, the farm in Sherwood, North Dakota, belonged to all of us kids and would be divided equally among us, that we were just as entitled to the farm as he was, because after my mother's funeral we had a talk about it and that was his agreement with my two sisters and I."

On cross-examination, Franklin was asked specifically what interest he claimed in the property. He said that it would be one-fifth. He was examined as to whether his half sisters, Grace Conway and Alice Sulster, and his half brother, Barton J. Westergren, had an interest in the farm, and he stated "no". It would be perfectly natural for the mother to buy the farm for the children living with her at the time. It would be unnatural to presume that she made an advancement in favor of one as against the other four. The evidence clearly supports the conclusion that Alfreda Shong purchased the farm not only for Peter, but for the other four children; that she did not purchase it for the children of the first marriage, who were not living with her at the time.

Viewing the whole record, we hold, as apparently did the trial court, that the defendant has sustained the burden that was placed upon her and has established her case by that weight of the evidence which the law requires.

We believe that the evidence presented in this case constitutes more than a preponderance of evidence and is sufficient to overthrow the presumption in favor of the plaintiff's title. The proof is clear, specific and satisfactory. Carter v. Carter, 14 N.D. 66, 103 N.W. 425; Holler v. Amodt, 31 N.D. 11, 153 N.W. 465; Bernauer v. Mc-Caull-Webster Elevator Company, 41 N.D. 561, 171 N.W. 282.

The trial court saw and heard the witnesses except Franklin Shong, who testified by deposition. Under such circumstances the trial court's findings are entitled to appreciable weight. We believe, however, that the trial court was in error in determining that the property was impressed with a trust in the hands of Peter Shong in favor of all of the children of Alfreda Shong, both those of the first and second marriage. The evidence is clear that she bought it for Peter and the four children, Gladys Schmidt, Frances Shong, Hazel Shong and Franklin Shong, and that the title of Peter Shong is impressed with a resulting trust in their favor and that Peter Shong and his half brother and sisters hold the title to the premises as tenants in common, subject to a lien in favor of Peter Shong as determined by the trial court.

■ There remains but one further issue to be determined. P. M. Clark, a Mohall attorney, testified in this action. His testimony was objected to by the defendant on the ground that it was not admissible under the terms of paragraph 1, Section 31-0106, NDRC 1943, which provides:

"An attorney, without the consent of his client, cannot be examined as to any communication made by the client to him, nor as to his advice given thereon in the course of professional employment".

The basis of any valid objection under this statute must be grounded upon the relationship of attorney and client. Stormon v. Weiss, N.D., 65 N.W.2d 475, 520.

The burden of showing that such relationship existed is upon the objector. Stormon v. Weiss, supra, and cases therein cited. We must first determine whether the relationship of Mr. Clark and Alfreda Shong was that of attorney and client. The testimony indicates that Mr. Clark had known Alfreda Shong from about 1925 or 1927. He knew her husband, Ray Shong, and was somewhat familiar with the conditions of the Shong family. He stated that Alfreda Shong came to him for advice as an attorney. He was asked:

"Q. Did you know Alfreda Shong other than in your practice as an attorney? Did you know her personally, in a social way? A. No."

Hardly a year passed that Alfreda Shong did not come to him for some advice. She came to him for advice in 1941. Mr. Clark knew that the farm involved in this action had been taken by the county for taxes. She had been in his office after the property was forfeited. The testimony indicates that Alfreda Shong used to advise with him on "pretty near everything." She talked to him about the farm that she was living on. It further appears that she did come into his office at or about the time that the land was purchased in the name of Peter Shong. She told Mr. Clark about the purchase.

■ The testimony does not disclose whether Alfreda Shong paid for her advice or whether Mr. Clark was regularly retained as her attorney. But regardless of that fact, it would appear that the relationship of attorney and client existed between Mr. Clark and Alfreda Shong.

"Where an attorney is consulted and acting professionally it is not necessary, in order to render communications to him privileged, that he should require or be paid a regular retainer, or should charge or receive any fee for his advice or services." 70 C.J., Witnesses, Sec. 549, p. 407. See also 58 Am.Jur., Witnesses, Sec. 475, p. 266.

"The general rule is that all confidential communications between an attorney and his client, made because of the relationship and concerning the subject-matter of the attorney's employment, are privileged from disclosure, even for the purposes of the administration of justice, and regardless of the manner in which it is sought to put them in evidence, unless the client himself consents to such disclosure or otherwise waives his privilege." Volume 1, Thornton on Attorneys at Law, Section 92, pages 154 and 155. See also 70 C.J., Witnesses, Sec. 532, p. 397. In note 29 thereof are cited: Fosston Mfg. Co. v. Lemke, 44 N.D. 343, 175 N.W. 723; Leistikow v. Zuelsdorf, 18 N.D. 511, 122 N.W. 340.

■ Communications made between attorney and client may be waived. See Volume 1, Thornton on Attorneys at Law, Section 128, pages 221 and 222. The privilege may be waived by the client's executor or administrator. There is no waiver involved here.

■ The trial court reserved its ruling on the admissibility of the testimony of Mr. Clark. It would appear that his testimony comes within the terms of our statute and was inadmissible, and therefore, we have not considered it.

The judgment of the trial court is modified to conform to this opinion, and, as modified, is affirmed.

BURKE, C. J., and SATHRE, MORRIS and GRIMSON, JJ., concur.