Edith C. VAN SICKLE, as Administratrix of the Estate of G. R. Van Sickle, deceased, C. E. Wood, Mary Jones, Valborg Anderson, Thomas Coons, Robert Coons, A. M. Fruh, Hazel M. Byorum, Sam Sawamura, A. F. Thompson, Dorothy Coons, Plaintiffs and Respondents,

v.

Chester OLSEN, Yates Thomas, Avis Winnifred Thomas, Ellis L. Methany, Phyllis Ann Methany, Amerada Petroleum Corporation, Defendants and Appellants.

No. 7745.

Supreme Court of North Dakota.

Nov. 3, 1958.

Michael R. McIntee, Williston, Bjella, Jestrab & Neff, Williston, and Joseph C. McIntee, Towner, for appellants.

Richard H. McGee, Minot, for respondents.

GRIMSON, Chief Justice.

This is a case to determine title to the N½ of the SE¼ and the S½ of the NE¼ of Section Seventeen (17), Township 154, Range Ninety-six (96), including six percent of the mineral rights therein, and to an undivided one-fourth of one percent of royalty of all the oil and all the gas produced and saved from the following 880 acres of land, towit:

> The S½NW¼ of Section 14; the E½NE¼ of Sec. 15; Twp. 153, Rge. 96; the W½NE¼ and the N½NW¼ of Sec. 15; the W½SE¼, the S½ NW¼, the W½SW¼, the NE¼SW¼ Sec. 15; Twp. 153, Rge. 96; the NW¼NW¼ of Sec. 22, Twp. 153, Rge. 96; the NW¼ of Sec. 26; the SE¼SW¼ of Sec. 14; the NE¼ NE¼ of Sec. 23, Twp. 153, Rge. 96, McKenzie County, North Dakota.

hereinafter referred to as Royalty No. 1, and an undivided one-and one-fourth percent of Royalty of all the oil and of all the gas produced and saved from the following 240 acres of land, towit:

EE

E½NW¼, the E½SW¼, the N½ NE¼ of Sec. 35, Twp. 155, Rge. 96, Williams County, North Dakota.

hereinafter referred to as Royalty No. 2. Plaintiffs claim ownership of nine-tenths of said royalties and admit that the defendant, Olsen was the owner of one-tenth thereof. Defendants Methany claim to be the innocent purchasers of Royalty No. 1, from defendant Olsen, and the defendants, Thomas, claim to be the innocent purchasers of Royalty No. 2, from defendant Olsen. An accounting by defendant, Amerada Petroleum Corporation of payments made to Chester Olsen on those royalties is also prayed for.

The judgment awarded a one-tenth interest in the N½ of SE¼ and S½ of the NE¼ of Section 17, Twp. 154, Rge. 96 including six percent of mineral rights therein and one-tenth interest in Royalties Nos. 1 and 2 to each of the following:

a. To Edith Van Sickle, of Minot, North Dakota, as administratrix of the Estate of G. R. Van Sickle;

b. Gene Wood of Minot, North Dakota;

c. Mary Jones of Medford, Oregon;

d. Valborg Anderson of Minot, North Dakota;

f. A. M. Fruh of Bismarck, North Dakota;

g. Mrs. Hazel Byorum of Minot, North Dakota;

h. Sam Sawamura of Minot, North Dakota;

i. A. F. Thompson, of Minot, North Dakota.

One-third of one-tenth interest to each of the following:

e. Thomas Coons, of Minot, North Dakota; Robert Coons of Minot, North Dakota; Dorothy Coons, of Minot, North Dakota, as heirs at law of Thomas Coons, deceased, each a one-third of one-tenth interest thereof.

One-tenth of the Royalty No. 1 to Ellis L. Methany and Phyllis Ann Methany or their successors or assigns;

One-tenth interest in Royalty No. 2 to Yates Thomas and Avis Winnifred Thomas or their successors or assigns;

One-tenth interest in N½ of SE¼ and S½ of NE¼ of Section 17–154, Rge. 96, including six (6) percent of mineral rights to Chester Olsen.

The defendants appeal from this judgment and ask for a trial de novo.

The complaint alleges that in 1936 a group of ten men, living in or near Minot, North Dakota, contributed $100 each towards the purchase of oil, gas and mineral rights. This is admitted by the answer. Some purchases were made and the instruments concerning them were deposited with H. E. Byorum, the Vice President of the First National Bank of Minot. Defendants also admit that amongst those purchases was the land in Section 17–154–96, but allege "said property was later lost for taxes."

Before Byorum died he seems to have turned this matter over to G. R. Van Sickle. Mr. Van Sickle does not seem to have done anything about the matter except to write the county auditor regarding the taxes on the land in Section 17–154–96. Nothing further was done until a file entitled "Nesson Flats Trust" was discovered in the files of G. R. Van Sickle by Mrs. Van Sickle, his administratrix, on March 26, 1953. In that file was found a statement by Mr. Byorum concerning the trans-

action had by these ten men. After a sufficient foundation was laid that statement was received in evidence. It reads as follows:

"Minot, North Dakota.
"November 17, 1937

"H. E. Byorum as Trustee for the land and royalties described in the attached list. There are ten parties who have one-tenth undivided interest in this attached list.

"The deed to the land has never been recorded as there is unpaid taxes against the land.

"The royalties are now in the name of Chester W. Olsen and there are blank assignments from Chester Olsen in this file. In case there should be a new trusteeship designated the proper way to do this would be to call all the parties who have an interest in this trusteeship together and have them elect a new trustee.

"H. E. Byorum."

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

The "attached list" sets forth the following:

"Williams County Land.

"1.  N½SE¼, S½NE¼ Sec. 17–154–96
Price paid for land with 6% oil and gas rights,     $650.00
¼ percent royalty on 880 acres,     150.00

"2.  E½NW¼, E½SW¼, N½NE¼, Sec. 35, 155–96
1½ percent royalty,     200.00
_____
$1000.00

"Parties Holding Interest in Land and Royalty

| | | |
|---|---|---|
| Chester Olsen | Minot | $100.00 |
| G. R. Van Sickle, | " | 100.00 |
| Gene Wood, | " | 100.00 |
| Mary Jones (Ira) | " | 100.00 |
| John Anderson | " | 100.00 |
| Thomas Coons, | " | 100.00 |
| A. M. Fruh, | " | 100.00 |
| H. E. Byorum, | " | 100.00 |
| Sam Sawamura, | " | 100.00 |
| A. F. Thompson, | " | 100.00" |

The last nine men named or their successors in interest are the plaintiffs in this action. The first man named or his successors in interest are the defendants.

Included in the file with this statement was a quitclaim deed of the land in Sec. 17–154–96, from Wells Dickey Co. to H. H. Hester, dated Feb. 21, 1936, and a warranty deed for the same land, executed and acknowledged by H. H. Hester before H. E. Byorum with the name of the grantee left blank. There were also other papers concerning this land and a reference to unpaid taxes, which defendant Olsen testified the group did not have the money to pay, so the Wells-Dickey Co. deed was not recorded. It is admitted that that land was afterwards sold for taxes.

In that file also was the assignment of H. H. Hester to Chester W. Olsen of Royalty No. 1, heretofore described, dated Sept. 4, 1936, and duly acknowledged. Attached to that assignment is the assignment of said Royalty No. 1 by Chester W. Olsen, dated the 10th day of September 1936, and acknowledged before H. E. Byorum, Notary Public, on that date but with the name of the grantee left blank. There also was included in that file the assignment of H. H. Hester to Chester W. Olsen of Royalty No. 2, dated May 27, 1936, and acknowledged on that date before A. M. Fruh, Notary Public. Attached to that assignment was another assignment by Chester W. Olsen of Royalty No. 2, duly acknowledged on the same date before H. E. Byorum, Notary Public, but with the name of the grantee left blank. These were the assignments referred to by Byorum in his statement.

Mrs. H. E. Byorum identified the signatures of her husband on these instruments. H. H. Hester identified his signature to the deed and the assignments, and defendant Chester W. Olsen admitted his signatures on the blank assignments. Art Thompson testified to receiving a statement from Byorum showing receipt of his $100 by Byorum, and also his interest in the property bought with his money. Valborg Anderson testified that Byorum sent her a copy of his statement heretofore set forth.

Mrs. Van Sickle turned the Nesson Flats Trust file over to her son, Bruce Van Sickle, an attorney. They invited Chester Olsen to come in and go over the file with them. That he did in March 1953. At that conference the Nesson Flats Trust file was examined. Mr. Olsen claims that he considered the file only in so far as the purchase of the land in Section 17 was concerned. He admits taking part in the group to that extent. That transaction involved $650, about two-thirds of the total capital of the group. Mrs. Van Sickle and Bruce Van Sickle both testify, however, that the whole file was amicably considered by the three of them and the inference they drew from that conversation was that Mr. Olsen admitted the existence of the group and his interest therein as shown by the Nesson Flats Trust file. They further testified that Mr. Olsen made no claim then of individual ownership of any part of the property which the file indicated belonged to the group. The three of them concluded that Bruce Van Sickle should write all who had an interest in the group, and that he, as attorney for the group, should investigate the status of the property listed, the expense of which was to be borne, one-tenth by each one of such interest holders.

Mr. Olsen agreed to pay his share, which he later did. Mr. Olsen brought some certificates of oil royalties of his own to the conference which he engaged Mr. Van Sickle to investigate, Mr. Van Sickle did, and made a report to Olsen on the certificates left with him and the result of his examination, and billed him separately for that service, which Mr. Olsen paid.

Mr. Van Sickle, in accordance with the agreement reached at that conference in March, and as attorney for the group, sent a letter to each of the ten members of the group, or their successors in interest.

A. F. Thompson, one of the original ten and one of the plaintiffs in this action, testified that after he received Van Sickle's letter he had a talk with Chester Olsen and stated: "We talked about this joint venture that I was in on, also that he was interested in, and I was interested in." No question was then raised by Olsen as to the ownership of these royalties.

Mr. Van Sickle continued his investigation and there were no further developments or claims made by Olsen until the fall of 1953. By that time, apparently, Olsen had hired his own attorney and demanded of Van Sickle that the Nesson Flats Trust file be turned over to him. That Mr. Van Sickle refused to do unless the

other members of the group so directed. Then Olsen demanded that Van Sickle send copies of the Nesson Flats Trust file papers to his personal attorney. This Mr. Van Sickle did.

Now, after the disagreement with the Van Sickles, Olsen makes a claim to the effect that the assignments of the royalties here in issue were, he thought, included in those other assignments of his own, he had given Van Sickle to investigate for him, personally, and that they had never been returned. The only grounds he gave for that belief was that he thought he owned more royalties than Van Sickle's report showed. When asked on cross examination: "Q. You think you had them?" he answered: "That is as far as I will testify to and that is the truth." "Q. And it could be just as well that they sat up there in the Van Sickle Adjustment Service from 1937 on?" "A. That could be as far as my recollection." Olsen is contradicted by Mr. Van Sickle and the Nesson Flats Trust file of Mr. Byorum which shows those assignments were in that file since Nov. 7, 1937.

The plaintiffs contend that the intent of the group of ten men was that when the legal title of the property bought was held in the name of one of the men it was for the benefit of all, and amounted to a resulting trust. Mr. Byorum had the confidence of all the men and managed the business for the group.

■ Section 59–0105 NDRC 1943, provides that: "An implied trust is one which is created by operation of law." An implied trust may be either a constructive trust or a resulting trust. See 89 C.J.S. Trusts § 15, pp. 726–729. A resulting trust is a creature of equity and is based on the equitable doctrine concerning consideration, the doctrine that valuable consideration and not legal title determines the equitable title of interest. One type of such a trust is when a purchase has been made and the legal estate is conveyed or transferred to one person but the purchase price has been paid by others. See 89 C.J.S. Trusts § 98, p. 940.

The royalty assignments in question transfer the named percentages of the right, title and interest in and to all the oil "produced and saved from the hereinafter described lands". We have held that such royalties are an interest in real property. Corbett v. La Bere, N.D., 68 N.W.2d 211, 213, 214.

Sec. 59–0106 NDRC 1943, provides that an implied trust arises in the following cases: "4. When a transfer of real property is made to one person and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made."

In Fox v. Fox, 56 N.D. 899, 219 N.W. 784, 788, we held that a resulting trust in land may be established by parole evidence. That case also cites Cutler v. Tuttle, 19 N.J.Eq. 549, as follows: "'where the consideration proceeds from two or more persons jointly, * * * a resulting trust will arise in proportion to the amount of the consideration which they have respectively contributed.'"

In Shong v. Farmers' & Merchants' State Bank, N.D., 70 N.W.2d 907–911, we held that the expressions and the conduct of the parties might be considered in determining whether there existed an intention to create a trust relationship, and that a transaction in which the property was purchased for the benefit of certain children, with title running to one son, gave rise to a resulting trust.

■ In the case at bar the evidence clearly indicates that the group of ten men furnished the money to buy the oil interests involved in this action; that they intended that the holder of the property was holding it for the benefit of all ten men, one-tenth for each one, and that they trusted Byorum to handle the matter for them.

The royalties in question here had been bought by Chester W. Olsen and, according to Byorum's statement, with the money contributed by the beneficiaries of the trust. Olsen turned over to Byorum not only the assignments of the royalties he had bought but also assignments of the same royalties executed by himself in blank which he acknowledge before Byorum. Hester also turned over to Byorum his deed to the land in Section 17–154–96 which he had sold to Byorum for the trust, together with a blank deed for the same property executed by himself. That seems to have been Byorum's method of handling the trust property but there is no evidence to show how the blanks were to be filled in.

■ Granting that the legal titles remained in Olsen and Hester after the delivery of the blank assignments and deed it is clear that the property involved belonged to the group and that Olsen and Hester were holding the legal title for the benefit of the group.

These transactions had exhausted the $1,000 contributed by the group. Byorum and Van Sickle, his successor, had died. The trust matter lay dormant until the Nesson Flats Trust file was found in 1953. Then when Olsen was notified he came in and the Nesson Flats Trust file was thoroughly examined. He did not then claim any interest other than the group interest, as is shown by his agreement to have Bruce Van Sickle investigate the property, and to pay his one-tenth of the expenses thereof, and by his talk with the Van Sickles and Anderson. Some months later, something changed his mind. He then began to claim ownership of the oil properties. He then somewhat weakly advanced the claim that he thought those assignments had always been in his possession, and further that he had thought he had more royalties than he found he actually had, and finally, that "If I signed those things in blank, all these leases in blank, I did it with the understanding that each one of my daughters was to have some royalties, Phyllis Ann Meth-

any, Clarice Foblkorn, Avis Thomas." Then in January 1954, he disregarded the blank assignment he had made for Byorum and made new assignments of Royalty No. 1 for one-fourth of one percent royalty in the 880 acres to his son-in-law and daughter, Ellis L. Methany and Phyllis Ann Methany, for $1 and other consideration, and an assignment to his son-in-law and daughter, Yates Thomas and Avis Winnifred Thomas, of Royalty No. 2, for 1½ percent royalty in the 240 acres, also for $1 and other consideration.

■ Defendant Olsen's actions speak louder than his words. The evidence clearly warrants the holding that he was one of the original group of ten; that he bought the assignments of royalties here involved for them and turned them over to Byorum to keep for the benefit of the group; that when he first knew about this Nesson Flats Trust file he admitted he belonged to the group and made no claim of ownership except as a member of the group. He found, however, that the assignments of the royalties involved were in blank. Apparently when he learned the legal effect thereof he concluded that he would claim title to these royalties for himself. He then executed new assignments of the royalties involved to his daughters and their husbands.

■ Olsen was holding the legal title to the royalties in question as a trustee for the group. As such he had no right to assign those royalties as his own. He had paid only one-tenth of the cost. He could not use them for his private purposes. Section 59–0110 NDRC 1943, provides:

"A trustee shall not use or deal with the trust property for his own profit or for any other purpose not connected with the trust, * * *" See also 90 C.J.S. Trusts § 289, p. 433.

Olsen's assignments of the royalties in question constitute a wrongful conversion thereof.

The Thomases and Methanys are defendants in this action. In addition to a gen-

eral denial, they claim ownership. They also made a counterclaim asking that the plaintiff's claim be declared null and void and the title quieted in them. They base their claim on the assignments Olsen made to them of the royalties owned by the group. They offered no evidence whatever to support their counterclaim. There is no consideration proven, no good faith shown. Olsen's testimony was that if he signed those assignments found in the Nesson Flats Trust file in blank he did it "with the understanding that each one of my daughters was to have some royalties." The inference is that he was making the assignments to them as a gift.

By the assignments the Thomases and Methanys received they acquired no equity superior to the plaintiff's claim to the trust estate. Baker v. Applen, 181 Ark. 454, 26 S.W.2d 109. They took the assignments subject to the trust whether or not they had notice of the trust or the breach thereof, and will not be permitted to profit through the breach of the trust by Olsen. 3 Scott's Trusts, Second Edition, Section 289, pp. 2175, 2176. They were merely holding the legal title that Olsen had and for the benefit of the trust.

■ Defendant, Chester Olsen, however, had a one-tenth interest in the trust. As stated in 16 Am.Jur., Deeds, Section 327, p. 623, although by reason of the fact that the grantor does not have the estate which he undertakes to convey, a deed may be ineffective to convey to the grantee the full interest or estate which it purports to convey, it will be effectual to convey any lesser estate than the grantor has.

■ It is clear, therefore, that the assignments of Olsen to his daughters and sons-in-law of the royalties in question, was effective only as to his one-tenth interest in the royalties involved. As to the remaining nine-tenths, the defendants, Thomases and Methanys are holding the legal title thereto for the benefit of the plaintiffs.

The Amerada Petroleum Corporation admitted that it is a producer of oil and gas on the N½NE¼ of Sec. 35–155–96, and asked the court to determine whether any of the parties to this action have an interest in the oil and gas produced from said land. The evidence shows that 1½ percent of the royalty from gas and oil produced on said premises was included in Royalty No. 2, of which Yates Thomas and Avis Winnifred Thomas are entitled to one-tenth, and are holding the legal title to the remaining nine-tenths for the plaintiffs in this action. The plaintiffs and the Thomases are entitled to royalties in proportion to their ownership.

The evidence shows that the N½SE¼, the S½NE¼ of Sec. 17, Twp. 154, Range 96 had been bought for the trust but title was lost by the failure to pay taxes. Tax deed was issued to McKenzie County, North Dakota, March 1, 1940. There is no evidence of redemption or repurchase, nor what, if anything, has happened to the title to said land since that time. The findings of the court as to the ownership of the parties in that land refers only as to whatever interest if any they each may now have in said land. Judgment of the district court is affirmed.

MORRIS, SATHRE, JOHNSON and BURKE, JJ., concur.