[File No 7007]

DANIEL KOLB, Respondent, v. KARL KOLB, Appellant.

(26 NW2d 484)

Opinion filed March 22, 1947

*J. A. Coffey,* for appellant.
*Rittgers & Hjellum,* for respondent.

BURKE, J.  The question in this case is whether an assignment of a contract for deed, executed and delivered by the plaintiff,

Dan Kolb, to his father, the defendant Karl Kolb, was executed as an outright assignment or to secure the payment of a debt.

Following a "talk" with his father in the fall of 1941, Dan Kolb made a written offer to the Federal Land Bank to purchase a half section of land in Stutsman County, known as the Dolliver farm. At the time of making his offer, he paid down two hundred dollars which was furnished to him at his father's instance from money belonging to the father. The terms of the offer required, in the event of its acceptance, the payment of an additional four hundred dollars as a condition for the issuance of a contract for deed. The offer was accepted and a proposed contract for deed was forwarded to Dan Kolb for execution. He signed the contract on November 15, 1941 but did not at that time pay the required four hundred dollars. On December 8, 1941, the father borrowed three hundred dollars from a bank at Medina and paid the four hundred dollars, ostensibly at least, on behalf of his son, to the agent of the Federal Land Bank. Thereafter, on December 18, 1941, the son executed and delivered to his father the assignment which is at issue in this law suit. The assignment is unequivocal in its terms. It purports to transfer without qualification from son to father the contract for deed to the Dolliver farm. At the time of the execution of this assignment the executed contract for deed had not been delivered to the son. In fact, by coincidence, it was signed by the authorized officers of the Federal Land Bank on December 18, 1941. In February or March, 1942, Dan Kolb and his wife moved to the Dolliver farm. Although Dan was thirty-four years old at the time and had been married for three years, he had never lived anywhere but on the father's farm. Both Dan and his wife had worked for the father. They received no wages, but had their board and room. They also farmed a small tract of land in the neighborhood. On March 11, 1942, the executed contract for deed was forwarded by the Federal Land Bank to Dan Kolb.

Dan Kolb farmed the land in 1942. The crop was small due to hail damage. The father helped with harvesting and threshing and the entire crop was taken and sold by Dan. On November

25, 1942, Dan paid the 1941 taxes upon one quarter section. On December 9, 1942, he made a payment of $194.79 upon the contract with the Federal Land Bank. On December 14, 1942, he paid the insurance premium upon a policy insuring the farm buildings against loss by fire or windstorm.

Dan also farmed the land in 1943. Again the father helped with the harvesting and threshing and again Dan took the crop. On November 22, 1943, he paid the 1942 taxes upon the entire tract and the balance due upon the 1941 taxes. On December 14, 1943, he paid another year's premium upon his fire and windstorm insurance.

In the meantime, however, the father presented Dan's assignment of his contract for deed and the contract itself to the agents of the Federal Land Bank, together with his check for the entire balance due on the contract. These were forwarded to the Land Bank together with the letter of the agent dated November 22, 1943, requesting that a deed to the property be issued to the father, Karl Kolb. The deed was executed upon December 2, 1943, and recorded upon December 7, 1943.

In January 1944, the father consulted a lawyer for the purpose of taking legal steps, if necessary, to collect rent from his son, Dan. An action was commenced for that purpose but before it was tried Dan brought this action praying that his contract assignment to his father be declared to be executed as security for the repayment of money his father had loaned him to make the original payments upon such contract. The father stood upon his record title but the trial court found in favor of Dan and judgment was entered granting the relief prayed for. Defendant appealed from the judgment and the case is here for a trial de novo.

As to the facts related so far in this opinion there is no dispute, but here the agreement ends. Dan testified that his father told him at the "talk" in the fall of 1941 with respect to the Dolliver farm, "he would borrow me the money to buy it with" and "I said all right I will give you that money back next fall." The father testified. "I told my wife we buy this place and my wife said, buy it in Dan's name and I pay the payments and give

him one-fourth share, and he said yes, I do this so you get the place." To explain the fact that the purchase was made in Dan's name, he said, "Well you know I had a quarter with the Federal Land Bank, and he says I can't buy this in my name, so I bought it in his name." Just who the "he" referred to in this testimony is, is not stated in the record. Presumably it was some unnamed agent of the Federal Land Bank. There is other testimony in the record to the effect that at that time the father was in default upon an indebtedness to the Federal Land Bank and under the bank's rules he was ineligible to purchase land upon contract.

The father testified that shortly after the original agreement with Dan, he heard that Dan had made a statement that he was "going to fix the old man." The evidence concerning this statement is rather involved. Dan's sister, Martha, testified that her brother Ed, told her that Dan had made the statement and suggested that she tell her mother. She then told the mother and the mother told the father. Dan denied that he had made the statement and Ed denied that Dan had ever made such a statement to him or that he had ever told his sister that Dan had done so. No one testified as to what the expression "fix the old man" imported. It strikes us as unusual that Ed who was living at home at the time would choose such a circuitous route to convey a message to his father. On whichever side the truth lies, however, it is clear that at some indefinite time after the original agreement, the father and especially the mother urged Dan to make the assignment of the contract. Concerning this report and its effect the father testified: Q. "Did you talk with Dan about that?" A. "Yes." Q. "You told him you heard that?" A. "Yes." Q. "What did that have to do with you paying the $400.00 after that?" A. "I said I will never give you more money." . . . Q. "At that time this talk was being had there about Dan's fixing the old man, and you said you wouldn't furnish any more money until he made an assignment?" A. "Yes." Dan testified as follows: Q. "When did you have your talk about giving an assignment in the first place?" A. "He always wanted me to sign some papers for security, so he made some papers and

I don't know what they made out." On cross-examination he testified. Q. "Dan, I will ask you, if before this payment was made and after you had received this blue paper (a copy of his offer to purchase) that I have here marked Defendant's Exhibit A., if you didn't tell your brother Ed that now that you had this contract you were going to fix the old man?" A. "No." Q. "And further that after they had demanded of you that you make this assignment—didn't your mother talk to you about that?" A. "Mother said I was supposed to make security when something happened. That is all."

The father also testified that before he paid the four hundred dollars, a Mr. Wilson, an agent for the bank had urged Dan to mortgage his property to make the payment. This testimony continues: The Court: "You say that in the bank, Wilson tried to get a mortgage and he wouldn't do it?" A. "He wouldn't do it." The Court: "Then he asked you for the money?" A. "And I said I wouldn't do it but —." The Court: "Just answer me." Then he asked if you would give the money." A. "Yes." Q. "Well now Karl, was that the first time you had arrived at an understanding with Dan—was that the first time you expected to advance the money?" A. "What do you mean?" The Court: "Did you expect Dan to pay that money and mortgage his stock?" A. "Sure." The Court: "You expected him to do that?" A. "Yes." The Court: "That was the $400.00?" A. "Yes."

In the main Dan's version of the transaction is corroborated by his wife while the father's statements are supported by his wife and his daughter Martha. There are many contradictions and inconsistencies in Dan's testimony and in that of his father, mother and sister. The extent to which such inconsistencies should weigh against the credibility of the witnesses is difficult to determine. Their language at the home is German. Dan, his father and sister speak English but their familiarity with the language is limited. The mother speaks only German and testified through an interpreter. Dan can read a little but cannot write except to sign his name. The father writes only in German. It is probable therefore that many of the apparent con-

tradictions are due either to a lack of understanding or to mis-understanding.

Some of the incompatibilities and contradictions, however, cannot be so attributed. In this category are the father's statements that he refused to give Dan any more money until Dan made the assignment, and that he expected Dan to mortgage his property to pay the four hundred dollars necessary to complete the down payment. Both of these statements are inconsistent with the father's contention that under his original agreement with Dan he was the real purchaser and was to pay for the land. The statements are not wholly consistent with each other. The implication of the first is that the father had agreed to give or lend Dan the money to make the down payment, while that of the second is that Dan was to make the payment out of his own resources.

Upon the principal issue in the case Dan is also corroborated by Clarence Seaborn, an agent of the Federal Land Bank. After stating that he was present in the bank at Medina on the morning of December 8, 1941, he testified: Q. "Do you remember seeing Karl Kolb come into the bank that morning?" A. "Yes sir." Q. "Did you also see a man by the name of Woodrow Wilson in there?" A. "Yes." Q. "Did they come in together Clarence?" A. "I don't recall that they came in the door together. They were in there at the same time." Q. "Did you hear the conversation or part of it that took place between Karl Kolb and Teddy George?" (George was an officer of the bank.) A. "Yes, part of it." Q. "What were they talking about?" A. "They were talking about borrowing money to make a payment on the loan to the Federal Land Bank." Q. "On what land?" A. "On the Daniel Kolb land." Q. "This land in question here?" A. "Yes." Q. "What did you hear Karl Kolb ask Teddy George?" A. "I heard him ask Teddy George how he could be sure he would get his money back from Dan. He borrowed it from the bank and paid it on the contract." Q. "What was Teddy George's answer?" A. "He said, one way you could do that would be to take an assignment of the contract for deed, and then when the money is paid back you could give him back the assignment." It is un-

disputed that ten days after this meeting in the bank, the father and son came to the bank together and the son executed the assignment which had been prepared by Teddy George.

From the time of the original agreement with his father, until he learned that the father had secured a deed to the land in question all of Dan's acts were consistent with his contention that he was the actual purchaser of the land. He made the 1942 payment on the contract for deed, he paid all the taxes and all of the premiums on the insurance upon the farm buildings. The father's explanation is that the payment on the contract represented his share of the 1942 crop and that by agreement Dan paid the taxes in lieu of rent for pasture. No explanation is offered concerning the payments on insurance. The father's testimony upon Dan's agreement to pay taxes is unsatisfactory. At one time he stated that at the time of the original agreement he told Dan if he paid the taxes he wouldn't have to pay pasture rent and that Dan just walked off without saying anything. Within a few minutes thereafter he testified that Dan had positively assented to the agreement. The father testified, too, that he paid part of the 1942 taxes. Such was not the case, but the testimony is nevertheless at odds with the claimed agreement. Furthermore when the father attempted to collect rent from Dan in January 1944, he demanded rent for pasture as well as a share of the crop.

This is an equitable action. The crux of the case is the intention of the parties. Altenbrun v. First Nat. Bank, 47 ND 266, 181 NW 590, 908; Dean v. Smith, 53 ND 123, 204 NW 987; Sherwin v. American Loan & Invest. Co. 42 ND 389, 173 NW 758. In order to determine that intent, a court of equity will consider all the circumstances of the transaction. Sherwin v. American Loan & Invest. Co. (ND) supra. The burden in this case is upon the plaintiff to establish that the assignment, absolute upon its face, was given as security, and the rule is that the proof must be clear and convincing. Dean v. Smith, 53 ND 123, 204 NW 987, supra; Jasper v. Hazen, 4 ND 1, 58 NW 454, 23 LRA 58.

In this case the trial court found in favor of the plaintiff.

These findings are entitled to appreciable weight upon this appeal. State, For the Benefit of the Workmen's Comp. Fund v. Williston, 72 ND 486, 8 NW2d 564; Boozenny v. Desenko, 72 ND 584, 10 NW2d 240. The rule, that the findings of the trial court are entitled to appreciable weight, has particular force in this case. Here, not only is the controlling factor the credibility of the witnesses, but many of the criteria by which an appellate court can judge credibility are of doubtful force. The trial judge did not believe the testimony of the defendant and his witnesses. He saw their behavior in court and on the witness stand. He heard them. All we have are their words in a language which is at best a secondary language with them.

From an examination of that record we have come to the conclusion that Dan's version of the facts is more reasonable and consistent than that of his father. His testimony is clear that the assignment in question was given as security. As with most parol testimony, its convincing force is largely relative in that it depends in a large degree upon the character of the testimony that is opposed to it. Giving to the trial court's findings the weight to which they are entitled, we find that plaintiff's evidence meets the requirement of proof in cases of this nature.

In reaching this conclusion we have not overlooked certain inconsistencies which counsel for defendant has pointed out in Dan's testimony, nor have we overlooked the testimony offered for the purpose of impeaching the witness Seaborn. These matters have been given full consideration.

During the trial of this case, much time was spent and much testimony was taken on the collateral issue of whether the father had stolen the original contract for deed from Dan. This testimony is wholly immaterial except in so far as it may reflect the credibility of the witnesses. Upon this matter, it is sufficient to say that we have examined this evidence and it tends to strengthen rather than weaken our convictions upon the main issue.

The judgment of the trial court sets forth in detail the manner in which Dan may satisfy his indebtedness to his father and recover record title to his land. The only exception to these

provisions is defendant's claim that an error of $16.00 was made in computing interest. If there are any errors in computation, they, of course, should be corrected. The judgment is affirmed.

CHRISTIANSON, Ch. J., and MORRIS, BURR and NUESSLE, JJ., concur.