[File No. 7041]

GLADYS AGREST, Respondent, v. JOSEPH AGREST, Appellant.

(27 NW2d 697)

Opinion filed May 22, 1947. Rehearing denied June 9, 1947

*F. T. Cuthbert,* for appellant.
*Sinnese & Duffy,* for respondent.

GRONNA, District Judge. This divorce action is here for trial de novo. The trial in District Court was held in October, 1946, shortly after this action was commenced. In December the trial court granted the wife (plaintiff and respondent) a decree of divorce and dismissed the counterclaim of the husband (defendant and appellant). The grounds for the divorce were extreme cruelty and habitual intemperance. The counterclaim alleged extreme cruelty and adultery.

There was a sharp conflict in the testimony. The trial court resolved those conflicts in favor of the wife by finding her allegations to be true, both as to the grounds for divorce and as to the ownership of the dwelling house, which is the homestead. As for the remaining property, the trial court held that "it should be divided equally between the parties."

The principal issue involves the problem of an equitable distribution of the property. The trial court assigned the homestead to the wife alone, and endeavored to divide the remain-

ing property approximately equally. There are no children. No alimony was asked for by or awarded to the wife.

1. The facts and circumstances of this case must be gathered from the conflicting testimony of the opposing parties, and their supporting witnesses. The "record" or Statement of the Case consists of the transcript of the evidence, typewritten on 310 pages, and numerous exhibits. Upon a trial de novo, the Supreme Court must ascertain the facts from the record before it, but, in making its determination, the findings of the trial court are entitled to appreciable weight. Nichols v. Schutte, ante, 207, 26 NW2d 515; Kolb v. Kolb, ante, 181, 26 NW2d 484; Buchanan v. Buchanan, 69 ND 208, 285 NW 75.

In 1903 the plaintiff was born Gladys Shrader on her parents' farm near Clyde, in Cavalier County, North Dakota. The defendant, Joseph Agrest, came to the farm in 1916 and remained there most of the time until 1919. He was born in Austria in 1900, and attended school there until he was nine. Then he emigrated with his aunt to Canada, where they settled at Winnipeg. In 1915 they immigrated into North Dakota. (Joseph testified that he was naturalized in 1933 or 1934.) He worked in a public grain elevator near Grand Forks. Then he became a farm laborer, threshing grain on a farm near Langdon. His first winter in the United States was spent in a lumber camp in northern Minnesota. During the summer of 1916 he came to the Clyde community, where he worked as a farm laborer in haying, harvesting and threshing. That fall he plowed for Mr. Shrader, plaintiff's father. That winter he lived at Shrader's and attended the Clyde elementary school for nearly a school year, during which period a competent and efficient teacher taught him reading, writing and arithmetic. Then his schooling was ended.

In the meantime Gladys was graduated from Clyde high school. Then she attended one year at Valley City State Teacher's College, following which she was a grade school teacher for two years. Next she attended the University of North Dakota at Grand Forks and specialized in Home Economics,

as her major course, and in Chemistry as her minor, and was graduated in 1927 with the degree of Bachelor of Science. During the next two years she was an instructor in the high school at Greenbush, Minnesota, where she taught Home Economics, and also General Science, Chemistry and Latin. The succeeding year she taught only Home Economics in a suburb of Duluth. Thereafter, because of her mother's illness (her mother was born in 1870) she thought it advisable to be near her home at Clyde. So in 1930 she accepted a position as dietitian and Home Economics instructor in the State School for the Deaf at Devils Lake, at an annual salary of $1,300, with board and room furnished by the school.

Meanwhile Gladys and Joseph kept up an intimate relationship. He was jealous of her and he objected to her having social engagements with other men. Also he was self conscious of and irritated by the fact that he spoke the English language brokenly and with an Austrian accent.

Commencing in 1922 and for ten years thereafter Joseph was employed in the Great Northern Railway roundhouse at Devils Lake as a Machinist's Helper, earning $150 or more each month. In 1931 he worked on the night-shift and during the daytime he worked in the newly established ABC Cleaners at Devils Lake. This was his first experience in the dry cleaning business.

In April of 1932 he quit the railroad and bought the ABC establishment for $1,200, which he borrowed because he was broke financially. From his fiance, Gladys, he borrowed $400, which was never repaid. $300 was borrowed on his A. O. U. W. policy and the remaining $500 was an unsecured loan from her father, Mr. Shrader. Later on these two loans were repaid from the profits of the business.

At the outset Gladys, after teaching hours, checked in the tickets on the clothes and did the bookkeeping. After their marriage, on May 29, 1933, she devoted her full time, including some evenings and Sundays, to the business. She also did her own housework.

Gladys took care of the front end as business manager. Joseph took care of the rear end of the shop, as operating manager, supervising the dry cleaning and pressing, and repairing the machinery. Their employees numbered only a few.

Gladys was helpful with the "spotting," for with her knowledge of home economics and chemistry, she knew the effect of chemicals on certain materials, and which chemicals to use on the different cloths. She also pressed silk dresses.

They were very ambitious and anxious to make their business a success, so Gladys started the route work. Joe's broken English would have made it difficult for strangers to understand him, and this Joe had found out when, in 1931, he had tried route work for the former owners of ABC Cleaners. So Gladys, herself, went out on the road soliciting business. With a motor vehicle, she and her sister collected clothes from many of the towns in the Devils Lake area, and later delivered them cleaned and pressed. This she continued to do until the roads were blocked with snow, just before Christmas of 1934. In the Spring of 1935 Joe took over this work. Gladys testified: "My parents forbid me to do it, said it was too hard for me, Joe was doing too much drinking and I thought possibly if he had this route work to do he would maybe attend to that better."

On the evening of May 29, 1935 (their second anniversary), as he alone was returning on a route, Joseph wrecked his 1932 Oldsmobile. In this accident the lower part of his right leg was torn off. The first time it was amputated seven inches and later four and one-half inches below the knee. He was hospitalized for over three months and had two special nurses. In December of 1935 he got his artificial limb but it was painful to use. In February, 1936, the leg stump became so badly infected that he had to go to the Mayo Clinic at Rochester, Minnesota, where he was hospitalized for over six weeks. The expenses at Rochester alone exceeded $2,000.

As a result of this accident, Joseph was absent from the business from May, 1935, until March, 1937. Furthermore, all of the many resulting expenses, added to the ordinary expenses of the parties, exhausted all of their cash resources, so that by

1939 they had nothing left but the dry cleaning equipment for which they had paid $1,200 in 1932.

Gladys' father died in 1938 and thereafter her mother, Louise Shrader, moved to Devils Lake and has lived most of the time since then with Gladys and Joseph.

From 1939 until December of 1943 (when his other leg was broken) Joseph was out on the road soliciting business practically every work day. One day a week Gladys herself continued to take care of the route work through her former home town of Clyde and on up to Sarles, near the Canadian border.

In 1939 Gladys acquired her separately owned establishment. On August 14, 1939, she purchased the Service Dry Cleaners in Devils Lake from James Heir. Joe had nothing to do with this deal. The purchase price was $6,000. For the payment, Gladys borrowed $4,000 from her mother, $1,200 from the Ramsey County National Bank, and $100 from ABC Cleaners. From that time Gladys operated Service Dry Cleaners as her business and Joseph operated ABC Cleaners as his business. Gladys repaid the loans out of the earnings of Service Dry Cleaners.

In December 1939, they made arrangements for Service Dry Cleaners to do the cleaning for ABC Cleaners, the consideration being Joe's mechanical repair work for Service Dry Cleaners.

In 1941 and 1942 Gladys built a new home costing about $10,000. She alone financed this cost from the earnings of Service Dry Cleaners, and with a $6,600 FHA loan from the Farmers State Bank of Minnewaukan, and an unsecured $2,000 loan from her mother. Joseph merely contributed some work valued at $110.

On December 16, 1943, Joseph had his other (left) leg broken in a car accident when he alone was driving on a route. His left leg was in a cast until March 9. His injuries confined him at home for over two months. ABC Cleaners was thus put out of business permanently.

Then for several months he suffered from gallstones, which were removed in December 1944 by an operation at Rochester,

where he remained until March of 1945. Gladys testified: "When he came back after his operation he thought he could take over and tell me what to do after I had run the business all these years which didn't sit so well with me. When he had an income it was all right but after he didn't have an income that is when this trouble began."

In response to cross-examination by Mr. Cuthbert, Gladys refuted the inference that she wanted to get rid of her crippled husband because he was a burden:

"Q. If I correctly understand your attitude you mean that Joe has rather been a burden on you?

"A. No, I wouldn't say that. I have tried all the time to get along. I feel badly about the divorce now even, to a certain extent. He wouldn't be a burden there if he were good to me."

In August of 1945 Gladys and Joseph had a conference with their respective attorneys, Duffy and Cuthbert, "to work out a plan to assure a little more peace and harmony and prevent a divorce". As a result of this conference it was agreed that both should sign the checks; that he would quit drinking and become the operating manager, and Gladys would continue as the business manager. Prior to that time the Service Dry Cleaners was Gladys' separate property.

Joseph became even more of a drunkard than before, and he became vicious toward her. Gladys testified that this was the beginning of "real terrible trouble. He drank once in a while . . . I had difficulty once in a while . . . but we kind of took care of those. He always used to say . . . when he came home drunk . . . the next day he would apologize and say he was sorry."

Now Joseph openly and publicly accused her of adultery. However, the preponderance of the evidence did not establish the truth of such extremely cruel accusations.

On February 11, 1946, the parties entered into a Contract for Deed wherein they together purchased the Glerum building wherein Service Dry Cleaners was situated. The purchase price was $10,000 of which $2,000 was paid in cash. The balance of $8,000 was to be paid at the rate of $2,000 annually on

the 10th of January, 1947, 1948, 1949 and 1950, respectively, and with interest at the rate of 4 per cent.

2. Jurisdiction in matters relating to divorce, alimony and property division is wholly statutory. See Leifert v. Wolfer, 74 ND 746, 24 NW2d 690, 169 ALR 633.

3. Rev Code 1943, 14–0505, defines extreme cruelty: "Extreme cruelty is the infliction by one party to the marriage of grievous bodily injury or grievous mental suffering upon the other."

Rev Code 1943, 14–0508 defines habitual intemperance: "Habitual intemperance is that degree of intemperance from the use of intoxicating drinks . . . which disqualifies the person a great portion of the time from properly attending to business, or which reasonably would inflict a course of great mental anguish upon the innocent party."

Section 14–0509 provides that habitual intemperance must continue for one year before it is a ground for a divorce.

The 310 page transcript is so full of evidence showing the husband guilty of habitual intemperance that it would be sufficient to say that he has drunk intoxicating liquor to excess since their marriage, and particularly during the past few years. This is established by direct evidence, corroborated by circumstantial evidence, namely, arrests, prosecutions and automobile accidents. During the past few years he has been arrested at least 8 times on charges growing out of liquor. He was twice arrested by federal authorities on the Turtle Mountain Indian Reservation for giving liquor to Indian women, and on one of such occasions he drove his car into a ditch, where it overturned. In Wells County he was tried on a criminal charge of driving a motor vehicle while intoxicated (on December 16, 1943). Altho acquitted by the jury, Joe now admits that he had drunk three glasses of liquor shortly before the accident, altho he denies that this intoxicated him. He also spent one night in jail at Rugby for being drunk and on which spree he had lost his pocket book. He was lodged in jail at Devils Lake at least twice to give him a chance to sober up, once when he was pulled out of his burning car in August 1945,

and once when he tried to abuse the police on May 17, 1946, because they had taken the ignition key from his car so that he would not drive when intoxicated. He was twice arrested in Ramsey County for drunken driving and while the first case was never tried, he was convicted on the second and that case is now pending in this court on appeal. (The driving was in Devils Lake in July, 1946, in the second case.)

We are of the opinion that the evidence sustains the decree of divorce on grounds of extreme cruelty and habitual intemperance.

4. Rev Code 1943, 14–0504, defines adultery: "Adultery is the voluntary sexual intercourse of a married person with a person other than the offender's husband or wife."

No good purpose would be served by commenting upon all of the evidence which the defendant introduced in support of his counterclaim. No direct evidence of adultery was introduced; no evidence that the wife had made admissions of adultery. As for the circumstantial evidence, suffice it to say that the circumstances were not such, indeed, as to "lead the guarded discretion of a reasonable and just man to the conclusion of guilt." Thayer v. Thayer, 101 Mass 111, 100 Am Dec 110.

The irritable and impatient nature of the plaintiff during the past two years was largely provoked by the drunkenness of and the extremely cruel accusations made by her husband.

We are of the opinion that the evidence sustained the trial court findings and decree against the husband on his counterclaim for divorce on grounds of extreme cruelty and adultery.

5. The plaintiff financed the building of the dwelling house. She took the legal title to it in her own name. It was her separate property. She repaid the $6,600 FHA loan out of the profits of her separately owned establishment. She completed payment of such loan in the Fall of 1944. Thereafter she continued to make payments on the $4,000 loan which her mother made to her in 1939 by way of financing the purchase of Service Dry Cleaners. Plaintiff has not yet repaid her mother for the $2,000 home-building loan.

Under the provisions of Rev Code 1943, 14–0525: "The court, in rendering the decree of divorce, may assign the homestead or such part thereof as to the court may seem just, to the innocent party, either absolutely or for a limited period, according to the facts in the case and in consonance with the law relating to homesteads. The disposition of the homestead by the court . . . (is) subject to revision on appeal in all particulars, . . . ."

Pursuant to such statutory authority the trial judge ruled in his memorandum of decision: "It naturally follows that the home in Devils Lake to which plaintiff holds the legal title should be and the same hereby is assigned and decreed to her absolutely, and likewise the homestead right of defendant therein is destroyed by the severance of the family relation, so that the homestead and appurtenances are assigned and decreed to plaintiff freed from any claim of right of homestead or interest or estate therein in favor of the defendant."

In our opinion the law and evidence support the assignment of the dwelling house to the wife.. We conclude that where, during coverture, the wife had built the dwelling house from the profits of her separately owned business establishment, wherein she and her husband worked together, and thereafter she was granted a divorce on grounds of extreme cruelty and habitual intemperance, and no alimony was awarded her, such decree assigning said homestead to her will not be reversed or modified.

6. Under the provisions of Rev Code 1943, 14–0524: "When a divorce is granted, the court shall make such equitable distribution of the real and personal property of the parties as may seem just and proper, and may compel either of the parties . . . to make such suitable allowances to the other party for support during life or for a shorter period as to the court may seem just, having regard to the circumstances of the parties respectively. . . ."

Construing such statute, in Rindlaub v. Rindlaub, 28 ND 168, 169, 147 NW 725, it was held that "the court in any event had

the right to make an equitable distribution of property upon granting of divorce, regardless of which party was at fault."

7. Inasmuch as Rev Code 1943, 14–0524 and cognate statutes contain no statutory enumeration of the "circumstances" to be considered in making an "equitable distribution", it logically follows that the division of property or adjustment of property rights upon a divorce generally depends on the facts and circumstances of the particular case.

8. Among the "circumstances" of the case at bar which are logically relevant and material to the issue of "equitable distribution", under the statute (14–0524), are those concerning the condition, needs and conduct of the parties, and, in particular, their respective earning powers as determined by the age, ability, experience and health of each spouse; and the amount of property owned by them, its nature, and the time and manner of its acquisition; in other words, the source from which it was derived, and how and when it was acquired, and whether the property is owned separately or jointly, and the equities of each spouse therein.

9. As respondent has not appealed, she can ask nothing affirmative at the hands of the court. Mahnken v. Mahnken, 9 ND 188, 82 NW 871. We must assume therefore that she is satisfied with the court's decree in this regard. Appellant contends, however, that he did not receive his equitable share of the property. What were the terms of the Decree? Altho the divorce was granted to the wife, she did not ask for alimony, and none was awarded to her. (During coverture the husband contributed little or nothing to her support. She contributed much toward his support, especially during the many months following his injuries. And since 1945, the husband has received $200 a month for himself alone from the wife's business establishment.)

The Decree permitted the wife to retain her 1939 Buick car. The husband was permitted to retain his 1941 Chrysler car for which the wife had paid $1,500 in 1943.

The husband retained ownership of all of the equipment and

machinery (costing $1,200 in 1932) of the defunct ABC Cleaners.

Personal effects, including clothing and jewelry, owned by each party were retained.

Cash assets, approximating $12,000, of Service Dry Cleaners, were divided equally.

The wife was permitted to retain ownership of her own business establishment, Service Dry Cleaners, for which she had paid $6,000 in 1939. Also sole ownership was assigned to her of the $2,000 equity in the Glerum building, wherein the establishment was situated. This equity was assigned to her subject to the lien of $8,000 or more of unpaid balance of purchase price which the wife alone must assume and pay.

Altho the investment value was only $8,000 ($6,000 plus $2,000), the trial court evaluated the establishment at $22,000, an appreciation of $14,000, or 180% in excess of the investment. Then the trial court awarded a cash allowance of $11,000 in lieu of a one-half share in the establishment.

We deem it unnecessary to comment beyond stating, by way of conclusion, that where, in the circumstances of this case, the wife was granted a divorce without alimony, and there are no children, and the homestead was assigned to her alone, and the trial court decreed that the remaining property (including money), whether separately or jointly owned, should be divided equally, and such division was approximately equal, such decree will not be modified.

10. The allowance in gross to the husband of $11,000 is payable as follows: $2750 on or before June 1, 1947, 1948, 1949 and 1950, with interest on any unpaid balance at the rate of three per cent from June 1, 1947. A judgment which, in whole or in part, directs the payment of a specified, fixed and determined sum of money, may become a lien, purely statutory, under the provisions of the "judgment lien" statute, Rev Code 1943, section 28–2013. See Leifert v. Wolfer, 74 ND 746, 24 NW2d 690, 169 ALR 633, supra.

Appellant complains that there is no real estate upon which such judgment lien can attach, inasmuch as the dwelling is a

homestead, and therefore exempt and the ownership of the Glerum building is only a $2,000 equity and not legal title. While such judgment lien would attach to real estate which the divorcing wife may hereafter acquire, as well as that which she might now own, appellant's contention appears well founded on the basis of the record before us. However, we do not have sufficient information as to the present circumstances of the parties to make provision for additional security. The security can be determined by the district court. Rev Code 1943, 14–0525, provides: "The court may require either party to give reasonable security for providing maintenance or making any payments required under the provisions of this chapter . . . ." See Leifert v. Wolfer (ND) supra.

Accordingly, under the remanding powers of the Supreme Court as set forth in Rev Code 1943, 28–2729, this case is remanded to the District Court for the determination of such issue of "reasonable security".

Upon all other issues the Decree of the District Court is affirmed, without costs to either party on this appeal.

BURR and MORRIS, JJ., concur.

BURKE, J. (concurring specially)  While I concur in the result in this case and generally with what is said in the opinion prepared by Judge Gronna, I think the conclusions stated therein as to the ownership of the property of the parties prior to the commencement of this action are too favorable to the plaintiff. In my judgment all of the property was owned by the husband and wife as partners and the agreement to that effect made in 1946 was but a ratification of a previously existing state of facts. Nevertheless, I agree that the division of property made by the trial court was just.

I think the record clearly discloses that it is for the best interest of both parties that the control and management of the dry cleaning establishment be left in plaintiff's hands. Both the value placed upon that establishment and the manner in which plaintiff is required to pay to the defendant the

amount of his interest therein are fair. I think too that it was proper to award the homestead to the plaintiff although in my view it was paid for with partnership funds. The amount of defendant's interest in the homestead was a proper charge against him for his cost to the partnership in loss of services, for medical and hospital bills and for wrecked automobiles which the record clearly shows resulted, in the main, from his own indiscretions.

NUESSLE, J., concurs.