Leo PAULY, Plaintiff and Appellant,

v.

Frank T. HAAS, Defendant and Respondent.

No. 7688.

Supreme Court of North Dakota.

July 26, 1957.

Bayard Lewis, Wahpeton, and Nelson & Clemmensen, Breckenridge, Minn., for plaintiff and appellant.

Johnson & Milloy, and Forbes, McMichael & Warner, Wahpeton, for defendant and respondent.

MORRIS, Judge.

In this action the plaintiff seeks to recover of the defendant the sum of $11,170 which he paid in part performance of an agreement dated December 31, 1953, and which the plaintiff claims to have rescinded on November 30, 1955, by serving a written notice upon the defendant. The case was tried to a court without a jury and pursuant to an order of the court made upon findings of fact and conclusions of law a judgment was entered dismissing plaintiff's cause of action with prejudice. From this judgment plaintiff appeals and demands a trial de novo.

For some time prior to the transaction involved in this case the defendant, Frank T. Haos, had been the owner of, or in control of, the common stock of Dakota Motors, Inc., operating an automobile sales, garage and repair business in the city of Wahpeton. The same business had formerly been owned by Haas individually. In 1952 and 1953 the operation was conducted by a manager who became ill. The business was losing money. About August 1, 1953 the manager left and the defendant assumed the management in person. He had other business interests. He decided to sell or liquidate Dakota Motors, Inc. He advertised for buyers without success until the plaintiff, Leo Pauly, became interested.

Pauly had been a resident of Wahpeton for approximately eight years and with the exception of the first year, he had operated his own electrical contracting business. He was well acquainted with Haas for whom he had done electrical work in the garage and other enterprises conducted by Haas. He had his motor vehicles serviced at the garage. On a number of occasions Pauly and Haas had conversations regarding the purchase of the business by Pauly who felt that the purchase would involve too large an undertaking for him alone.

Leonard Mackove went to work for Dakota Motors, Inc. as a salesman in February, 1953 and was so employed at the time of the negotiations which resulted in the purchase of the common stock of Dakota Motors, Inc. by Pauly and Mackove.

On December 18, 1953, Haas, Pauly and Mackove signed a memorandum agreement by which Pauly and Mackove agreed to purchase all the outstanding common stock of Dakota Motors, Inc. for the sum of $45,000. This memorandum provided:

"The assets of the corporation to consist as per the attached statement or as they may be changed by the December operation period."

No statement was actually attached to the memorandum but it appears that the parties had under consideration a typewritten statement of assets of the corporation dated November 30, 1953 which showed the net assets to be $55,722.24. This statement is known in the record as plaintiff's Exhibit D.

On December 31, 1953 Frank T. Haas as first party, Leo Pauly as second party, and Leonard Mackove as third party entered into a final written agreement for the sale of 224 shares of common stock each to Pauly and Mackove; 2 shares of stock were retained by Haas until the terms of the contract had been performed. He also retained his directorship in the corporation. He took the notes of the purchasers for

their respective shares of stock, but retained possession of the stock as security for the notes. It was also agreed that Pauly and Mackove were to take over the active management and control of the corporation on January 1, 1954 at salaries of $300 per month each. They agreed to devote their full time and effort to the operation and management of the business of the corporation. The business was to be continued in the building owned by Haas at a rental of $250 per month until a more suitable location could be found. It was also agreed that if because of the inexperience, ineptitude, inefficiency or incompetence of Pauly and Mackove, or either of them, or for any other reason, the corporation had a net loss in its operations for a period of several months, the voting powers of the purchaser should be suspended, and that Haas should have exclusive control of the management of the corporation until its operation showed a profit for at least two consecutive months.

The agreement also contained this provision, which is emphasized by the plaintiff as the basis of his right to rescind the agreement:

"The financial statement of said corporation for the period ended November 30, 1953, is hereto attached, marked Exhibit A, made a part hereof, and identified by the signatures of the parties hereto. The parties hereto base their dealings on said financial statement, and first party warrants that it is true and correct, and that the condition of said business shall remain substantially as shown by said financial statement, except as the financial condition of said corporation may be changed by normal operation of said business during the month of December, 1953."

No financial statement was ever marked as Exhibit A, attached to the agreement or signed by the parties. However, there was introduced in evidence a book of the corporation known as Exhibit C, containing a monthly financial statement covering several years. Among these is a statement for "Month of Nov. and 11 months ending Nov. 30, 1953." Plaintiff contends that this statement shows a loss of $520.92 for the period, that he relied on and was misled by it, and that the corporation actually lost in that period $15,072.75, the larger loss being concealed by irregular bookkeeping entries.

Pauly and Mackove took over the management of the corporation as provided in the agreement and operated it together until November 1, 1954, when Mackove went out of the business. The record does not show what became of his shares of stock or his interest in the business, but whatever was done appears to have been satisfactory to all parties concerned.

Pauly continued to operate the business alone from the time Mackove left until the end of November, 1955. On November 30, 1955 he caused to be served on Haas a "Notice of Rescission" stating that the contract of December 31, 1953 between Haas, Pauly and Mackove was rescinded. This Notice states in part:

"This rescission is based upon the ground that you fraudulently misrepresented the value of certain assets of said corporation in the following particulars:

"1. The financial statement of said corporation, above referred to, and for the period ended November 30, 1953, which you warranted as a true and correct statement shows the value of the repair parts to be $15,156.87, when in fact the true value of said repair parts at the time did not exceed $10,009.77.

"2. Said financial statement shows the value of the office furniture and fixtures of said corporation to be $7,051.70, when in fact the true value of said office furniture and fixtures at the time did not exceed the sum of $1,000.

"Said fraud was not discovered until October of 1955."

The notice further recited that Pauly relinquished all claim to the 224 shares of stock sold to him but in the possession of Haas and offered to do anything necessary to make Haas the owner of the stock.

The notice also tenders the property, accounts and keys under control of Pauly and demanded the return to him of the purchase price paid on the stock amounting to $10,500 and $670 interest, making a total demand of $11,170.

The final paragraph of the notice states:

"Upon your failure, within ten days from and after the date hereof, either to restore the said sum of $11,170 to the undersigned or to give notice, in writing, of your intention to acquiesce in this rescission, the undersigned will deem it as a fact that you refuse to acquiesce in said rescission, and will seek the aid of the courts in obtaining restoration."

Plaintiff's original complaint alleged the execution of the agreement of December 31, 1953, a copy of which was attached to the complaint. It was further alleged "that said financial statement of November 30, 1953 was false, deceitful, and fraudulent in that said financial statement showed the inventory valuation of the repair parts of Dakota Motors, Inc. to be $15,156.87, when in truth and in fact the inventory value of said repair parts did not exceed $10,009.77; that said financial statement was false, deceitful and fraudulent in that said financial statement showed the value of the office furniture and fixtures of Dakota Motors, Inc. to be $7,051.70 when in truth and in fact the value of said office furniture and fixtures did not exceed $1,000.00."

It is futher alleged that had it not been for the false, deceitful and fraudulent statements of the defendant, the plaintiff would not have entered into the agreement, and that upon discovering that the statements were false, and upon the refusal of the defendant to pay the amount necessary to make the parts and office furniture and fixtures reflect the value as shown by the financial statement, the plaintiff served a written notice of rescission from which we have quoted above. The plaintiff then demands judgment in the sum of $11,170, interest and costs.

The defendant answered, admitting the execution of the agreement, and denying any fraud on his part.

Before trial plaintiff amended his complaint. He omitted the allegations of fraud with respect to the office furniture and fixtures, and added some new ones. He stated, "that said financial statement of November 30, 1953 was false, deceitful and fraudulent in that said financial statement showed the net loss of the corporation to be $520.92, when in truth and in fact the net loss of said corporation was $15,072.75."

The plaintiff also alleged that the defendant fraudulently increased the net worth and book value of the corporation and the stock and decreased the amount of the net loss shown on the books of the company by removing from the corporate books rent expense in the sum of $3,400, by increasing the parts inventory in the sum of $7,000, and by transferring the sum of $1,200 of the reserve for bad debts to income accounts, as well as by crediting income with the sum of $2,951.83, which was in the reserve account, for repossessions.

The defendant answered the amended complaint by again denying fraud on his part, and alleged that after the execution of the agreement on December 31, 1953, and until October, 1955, the plaintiff personally managed the business of the corporation and gave no notice that he was dissatisfied with the agreement until he served the notice of rescission, and that by

the delay and by the operation of the business for almost two years the plaintiff waived any objections to or disagreement with the financial statement which he sets forth in the amended complaint and is barred by laches from objecting thereto. It is also alleged that any financial loss sustained by the plaintiff or by the corporation under his management was due to his gross incompetence and mismanagement, and that the plaintiff refused to employ good business practices, paid himself excessive compensation, and seriously damaged the financial structure of the corporation, and that the plaintiff abandoned the business with virtually no notice to the defendant, and left the corporation in such a depleted and weakened financial condition that the defendant has been required to liquidate it.

The findings and conclusions of the trial court indicate he found that the defendant made or directed to be made certain bookkeeping entries prior to the sale of the stock to Pauly and Mackove, and that these entries "(1) cancelled rent expense of $3,400.00; (2) increased book value of parts inventory in the sum of $7,000.00; (3) transferred $1200.00 of the reserve for paid debts to income account, and (4) credited income with the sum of $2,951.83 from the reserve for repossessions account."

The court reached the conclusion that no fraudulent representations were made by the defendant, and accordingly ordered judgment to be entered in his favor.

The plaintiff contends that the bookkeeping entries above set forth are the basis of a fraud perpetrated upon him in that they falsely inflated the book value of the assets of the corporation and reduced the loss for 1953. Haas, on the other hand, contends that all of the entries were legitimate and were openly shown on the books which were made available to Pauly and Mackove, who spent several weeks in and about the business examining it and conferring with regard to it before the purchase of the stock was finally made.

Haas explains the cancellation of rent by stating that he was preparing the business for liquidation, that he owned both the corporation and the building in which it was operated, and that considering the fact that the business was losing money, he decided to cancel the rent, which was merely a debt owed by the corporation to himself personally, thus simplifying his income tax reports.

The greatest controversy developed over the increase of $7,000 in the book value of the parts inventory. His explanation for that is that the value of these parts had been built up over some period of time, and that the books of the corporation did not reflect the actual value of the parts, so he raised their book value by the entry of $7,000 in order to bring the book inventory up to somewhere near the actual value. The plaintiff, on the other hand, contends that this entry brought the book value far above the actual value and was therefore fraudulent.

The plaintiff and Mackove took no inventory at the time of the purchase of the stock. Haas testified that he suggested that they do so. Pauly, on the other hand, testified that when he suggested to Haas that an inventory be taken, "he actually got kind of huffy, and said he's been running a garage for forty years and keeping a perpetual inventory that way, and he don't see why he should take any now it's always been right within a few dollars."

Parts and accessories were bought and sold under the management of Pauly and Mackove, and later under the sole management of Pauly until about November 1, 1955, when Pauly caused an inventory to be taken by an employee which showed a total of $10,737.73. When Haas took over the management again, his inventory showed a total of $14,370.77 exclusive of accessories and oil, which he contends were worth between $5,000 and $6,000. The inventories taken by Pauly and Haas in the last part of 1955 and in January, 1956 have little probative value in determining the

worth of the assets of the corporation in December 1953. The plaintiff has failed to prove that at the time the purchase of the stock was made the value of the assets of the corporation was misrepresented to him by Haas through entries in the books of the corporation or otherwise.

When Haas resumed management of Dakota Motors, Inc., in August, 1953, the company owned a number of accounts receivable, and also had on its books a bad debts reserve of $1,200. Haas decided that in event of a sale of the business the purchaser would not want the accounts receivable, so he took them over personally and transferred $1,200 from the reserve, which was no longer needed, to the income account.

A similar transaction was carried out with respect to the reserve for repossessions account. Haas took over certain conditional sales contracts for cars sold by the corporation, and transferred $2,951.83 from the reserve for repossessions account to income.

Haas argues that by these transactions he personally removed undesirable assets from the corporation which left the reserves as free assets which enhanced the financial position of the corporation, and which was a proper and desirable step to take in either liquidating or selling the corporate business. The purpose of the reserve for repossessions account was to give the finance companies protection against loss on sales contracts. The entries were all made before Haas negotiated with Pauly with regard to the purchase.

Plaintiff's Exhibit C is a looseleaf book containing financial statements of Dakota Motors, Inc., on forms designed to show the financial condition of the corporation at the end of each month, beginning with December, 1951 through February, 1956. In the lower right hand corner of this statement appears a box under the heading "Profit or Loss—Current." In this box appear the names of the months of the year, opposite which there is a space for inserting the profit or loss for each month, and at the bottom is a space for inserting the "total to date." Pauly contends that he bought the business in part at least upon the basis that it was a going concern and that he was induced to purchase by the financial statement for the month ending November 30, 1953, and that this statement showed a loss for 1953 up to the date of purchase of only $520.92. His testimony shows that he knew that the corporation was losing money, that he was in and out of the office a number of times in November and December, 1953, and was around most of the time during December, or, as he puts it, "I was there I would say steady."

The books and records of the company were all available for his inspection, but he says, "I never went through them, because like I said, I wouldn't have known what I was reading if I did. I was studying that one statement, trying to learn what it was about." He then testified, "I figured the way it was run, if they was only losing $500, it should make money."

"Q. You want the court to believe that you looked at this statement that showed they were losing $500, and you were satisfied and quit there? A. I say I quit there, that's all I looked at.

"Q. All the other statements were there, and you never looked at them? A. I wouldn't say that. I looked at them, but I didn't go through them. I didn't know what the meaning of them was.

"Q. Mr. Pauly, you have been in business yourself, have you not? A. Yes.

"Q. You knew what a financial statement was? A. Not this type, no."

A casual reading of the financial statement upon which Pauly claims he relied discloses the weakness of his position. There is no statement of profit or loss shown for the various months of 1953 from

January to September, inclusive. The spaces following the names of these months are entirely blank. October shows a loss of $74.86, and November a loss of $446.06, making a total of $520.92 which Pauly claims he thought was the loss for the entire preceding eleven months of 1953.

A glance at the statement of September 30, 1953, contained in Exhibit C, shows the profit or loss for each of the first nine months of that year, and plainly written in red is the total loss of $9,808.20. It would not have taken a superior mathematical intelligence to have added to that sum the losses for October and November, shown in the November 30 statement to be $520.92, and to have arrived at the conclusion that in the first eleven months of 1953 the corporation lost $10,329.12.

The book Exhibit C, together with the statements therein contained, was in the possession of Pauly, as were all of the books and records of the corporation from the time he took over management of the business with Mackove on January 1, 1954 until he abandoned the business and Haas was compelled to resume its management about December 1, 1955. His continuous use of this book is shown by the fact that monthly financial statements were inserted in it during Pauly's period of management.

No minutes of the corporation or record of any action of the board of directors appears in the evidence. Whether any change in the relationship between Pauly and Haas resulted from the exit of Mackove does not appear other than that Pauly became the sole manager. Both Pauly and Mackove drew salaries of $300 per month until the former assumed sole management, during the last ten months of which Pauly drew $400 per month salary.

 It is the theory of this action that Pauly was fraudulently induced to enter into the contract for the purchase of stock of Dakota Motors, Inc., and that the plaintiff, on discovery of the fraud, rescinded the contract and is entitled to a return of that part of the purchase price which he paid. He attempted to rescind by serving a notice of rescission. That notice could be effective only if he was fraudulently induced to enter into the contract and rescinded promptly on discovery of the fraud. Actual fraud is always a question of fact. Section 9–0310, NDRC 1943, Schaff v. Kennelly, N.D., 61 N.W.2d 538. Fraud is never presumed. On the other hand, the presumption is that private transactions have been fair and regular. Strom v. Strom, N.D., 75 N.W.2d 750. Chester v. Einarson, 76 N.D. 205, 34 N.W.2d 418, 35 N.W.2d 137. The burden of proving fraud rests on the party asserting it. Zimmerman v. Kitzan, N.D., 65 N.W.2d 462. Hoffer v. Crawford, N.D., 65 N.W.2d 625. City of Vermillion v. Hugener, 75 S.D. 106, 59 N.W.2d 732.

██ ██ This case was tried to the court without a jury and is now here for trial de novo. The parties and other witnesses testified before the trial court. Their credibility and the inferences to be drawn from their testimony is of major importance. In State for Benefit of Workmen's Compensation Fund v. City of Williston, 72 N.D. 486, 8 N.W.2d 564, Paragraph I of the Syllabus by the Court, we said:

"Where on an appeal taken pursuant to § 7846, Comp.Laws 1913, as amended by chapter 208, Laws 1933 [Section 28–2732, NDRC 1943], the appellant demands a retrial of the entire case, the case must be decided on the record already prepared in the trial court, and the findings of the trial court must be given appreciable weight by the supreme court, especially when based upon the testimony of witnesses who appeared in person before the court."

The statement that in such case the findings of the trial court are entitled to appreciable weight on appeal to the supreme court has been repeated in many subsequent decisions, including Boozenny v. Desenko, 72 N.D. 584, 10 N.W.2d 240. Sinerius v. Anderson, 73 N.D. 269, 14 N.W.2d 230.

Verry v. Yuly, 73 N.D. 346, 15 N.W.2d 210. Kolb v. Kolb, 75 N.D. 181, 26 N.W. 2d 484. Nichols v. Schutte, 75 N.D. 207, 26 N.W.2d 515. Agrest v. Agrest, 75 N.D. 318, 27 N.W.2d 697. Belt v. Belt, 75 N.D. 723, 32 N.W.2d 674. Larson v. Cole, 76 N.D. 32, 33 N.W.2d 325. Bryan v. Schatz, 77 N.D. 9, 39 N.W.2d 435. Klundt v. Pfeifle, 77 N.D. 132, 41 N.W.2d 416. In re Heart River Irrigation District, 78 N.D. 302, 49 N.W.2d 217. State ex rel. Halvorson v. Simpson, 78 N.D. 440, 49 N.W. 2d 790. Ellison v. Ellison, 79 N.D. 46, 54 N.W.2d 656. Knell v. Christman, 79 N.D. 726, 59 N.W.2d 293. Ginter v. Ginter, N.D., 63 N.W.2d 394. Hoffer v. Crawford, N.D., 65 N.W.2d 625. Dockter v. Crawford, N.D., 65 N.W.2d 691. Shong v. Farmers' & Merchants' State Bank, Hutchinson, Minnesota, N.D., 70 N.W.2d 907. Little v. Burleigh County, N.D., 82 N.W.2d 603.

The book entries upon which the plaintiff bases his allegations of fraud were not per se fraudulent. They were not false entries. All of the books and records of the corporation were made available to the plaintiff and during his investigation prior to the purchase he looked at the books but claims that he did not understand them. He asserts that the only entries he studied were those appearing on the two pages of the looseleaf book, Exhibit C, purporting to be a financial statement as of November 30, 1953. He took these pages out of the office of Dakota Motors, Inc., and sought the advice of others with regard to his prospective purchase. As a result of this study and advice he entered into the stock purchase contract. In his testimony he reiterates his assertion that he relied on this two page statement to the exclusion of other statements and other records contained in the books of the corporation. Circumstances such as plaintiff's past business experience, the amount of time he spent in observing the operation of the business, and the fact that Mackove, his co-purchaser, was an employee of the corporation and familiar, at least to some extent, with its operation, weakens the credibility of plaintiff's testimony. There is no intimation that Mackove was a party to the alleged fraud. However, the greatest weakness in plaintiff's position appears upon the face of the financial statement upon which he relies. It does not show, as he claims, that the corporation lost only $520.92 during the first eleven months of 1953. The loss of that amount is shown to have occurred in October and November of 1953. This statement purports to show neither profit nor loss for the preceding months of that year.

The trial court reached the conclusion that the evidence failed to show that Pauly was induced to enter into the agreement for the purchase of stock by fraud practiced upon him by Haas. We agree with the trial court. The Judgment appealed from is affirmed.

GRIMSON, C. J., and SATHRE, JOHNSON and BURKE, JJ., concur.