Sophie STROBEL, Plaintiff and Respondent,

v.

Gottlieb STROBEL, Defendant and Appellant.

No. 7866.

Supreme Court of North Dakota.

March 21, 1960.

Murray & Rosenberg, Bismarck, for plaintiff and respondent.

Warren A. Tripp, McClusky, and W. J. Austin, Bismarck, for defendant and appellant.

MORRIS, Judge.

This is an appeal from a judgment granting the plaintiff a divorce from the defendant on the ground of extreme cruelty which is defined as "the infliction by one party to the marriage of grievous bodily injury or grievous mental suffering upon the other." Section 14–0505, NDRC 1943. The defendant denies that he inflicted extreme cruelty upon the plaintiff and as a further defense alleges that if grounds for divorce did exist in the past the acts constituting such grounds have been forgiven and condoned. The plaintiff in turn contends that if there was a condonation it was revoked and the original grounds for divorce revived by the commission on the part of the defendant of further acts of extreme cruelty.

The trial court found that the defendant compelled the plaintiff to work at heavy labor to excess and at times when she was ill and unable to work and that "he has been reluctant to provide the plaintiff with proper medical attention" and that these acts caused the plaintiff great mental and physical pain and suffering. No findings were made with respect to the matter of condonation.

The parties were married on March 19, 1932 and took up their married life on a farm. At that time the defendant owned a half section of land in Sheridan County. They prospered and at the time of trial the defendant owned property of the value of $200,000 or more, a substantial portion of which was in bank deposits and bonds. There were born to the parties as issue of said marriage three daughters, Maxine, age 25, Colleen, age 16 and Drosilla, age 12, and two sons, Ronald, age 23 and Roger, age 20. Maxine lives in Minot, North Dakota. The other children live with the father on the farm. None of the children is married. There is also living with the family on the farm a little girl six years of age who is not the child of either of the parties and whose presence there is of no moment in this case other than it appears that the judgment awards her custody to the plaintiff. Custody of the minor children of the parties was awarded to the defendant.

The trial was held in two sections, the first on November 26, 1958. An adjournment was taken until February 9, 1959, when the trial was resumed. In the interim the plaintiff went to the Mayo Clinic at Rochester, Minnesota, for examination and treatment which was financed by the defendant. The report of the clinic was stipulated into evidence and will be referred to later.

During the first part of the trial the plaintiff, who was 45 years old, testified that her husband made her go out every day and do outdoor work on the farm which was much too hard for a woman. She testified that she had a back injury from riding horseback. She said he made her work "ever since I lived with him; 26 years. * * * I'm just crippled from working. * * * Lower part of my spine is buckled up." She first went to the Mayo Clinic about December 1, 1957, where it was discovered that she had a goiter. She had previously taken weekly treatments from an osteopath in Bismarck, starting in March, 1957 and continuing until November. The defendant complained about her taking these treatments. The plaintiff testified at another time that the defendant did not compel her to do outdoor work after she went to the Mayo Clinic and discovered that she had a goiter. During the past four or five years the daughter did most of the heavy housework.

The plaintiff testified at some length to the effect that her husband did not tell her enough about the financial affairs and did not permit her to write checks. She admits, however, that she had authority to write checks on the bank account from 1952 until she left her husband in July, 1957. The defendant then withdrew this authority.

The home in which the Strobels lived was a story and a half bungalow. It is electrified, equipped with an electric stove, freezer, refrigerator, washer and other appliances. There is a drilled well near the house but running water has not been installed. The plaintiff complains of this but the defendant testified that he has offered to install running water in the house. Plaintiff was asked:

"Q. Isn't it a fact that he even offered to buy a home for you to live in Bismarck? A. Yes, he did, but I wouldn't accept it.

"Q. You wouldn't accept. Even though that means getting off the farm and no work and things of that kind? A. No. No, I wouldn't accept it."

On May 23, 1958, after this action was started the plaintiff went back to the farm to live with the defendant. She stayed until June 14, 1958, when she left again. Concerning this sojourn she testified as follows:

"Q. What did he tell you that caused you to go back to him? A. Well, he said he'd be different, and he made promises, which were broken.

"Q. What promises did he make? A. I told him I wouldn't go home, back, unless he'd give me the consent to write checks at both banks and have a joint bank account. Well, that promise didn't last."

On the occasion of her leaving the last time, plaintiff testified:

"Well, at the time I left the last time we had an awful fight. * * * Q. Well, did that fight come to actual blows? Did he hit you? A. Well, he pushed me down in the corner. I couldn't lift my arm for a whole week."

In another place in her testimony plaintiff described the occasion as being much more violent. She said:

"Well, we started in a red-hot argument and we beat each other with the fists, so he called for the boy. If it wouldn't have been for the girl, why, the boy would have gave me a beating. * * * He called for the boy

and he said the boy should straighten me out. So I said, I told the boy all he has to do is touch me or lay a hand to me and he was going to the pen. Which he would."

She also stated that the argument was over the stoppage by the defendant of the payment of plaintiff's checks.

Maxine Strobel testified as the corroborating witness for the plaintiff. She stated she was present when there were a number of discussions between her father and mother about the plaintiff doing outside work. It seems that the whole family worked outside at times. The witness said:

"There was just so much work to do we had to."

She knew that her mother had not been well for quite some time and her dad had wanted her mother to go out and work and she went. On cross-examination the witness testified that there was a lot of work to do and her mother had to go out and help, not her mother alone but also the children. They helped shock oats and hauled bundles.

Maxine said that her father "kind of objected" to her mother getting some dental work done but after a while he gave in. Maxine does not corroborate her mother with respect to the violent quarrel which her mother claims took place when she left the defendant the second time.

The defendant, who was 58 years old, testified in his own behalf. He does not want a divorce. His wife started talking about a divorce in 1952. She always complained about working in the fields with the result that she did very little of it. She did some shocking. She never drove a tractor. She cannot drive a car. The oldest daughter drove the car and took her mother when she wanted to go. The defendant received an injury to his eye in 1952 and went to the hospital. At that time he gave plaintiff a checkbook and the authority to write checks which continued up until the time the plaintiff left home in the spring of 1958. Plaintiff took care of all the checks that came in. She kept them in a big purse and when the defendant wanted to do any banking he asked her for the checks. He never kept her from knowing about the family finances or how much money was on hand. His wife has had poor health for the last five years. The girls did most of the housework during that time. She complained about her back. They had few arguments and got along better than most families. There was some argument when plaintiff left home the second time in June 1958. Defendant never denied her the right to medical or dental treatment. She took up music and instruction in accordion playing for about four years. The substance of this testimony was corroborated by the two sons and to some extent by the daughter Colleen Strobel. None of these children corroborate the plaintiff's testimony. They corroborate the father's testimony that there was no violence connected with the argument that took place when the plaintiff left home the second time and that the argument was chiefly over the right of the plaintiff to draw checks on the bank account.

A report of the Mayo Clinic was introduced in evidence and covers the findings made as a result of three visits of the plaintiff to the clinic, December 1957, April 1958 and January 1959. On the first visit she appeared to be under a great deal of nervous tension and quite depressed. It was thought that the tension factors had much to do with her complaints and she was advised to make every effort to resolve them. She complained of a backache which appeared to be muscular in character and she had some enlargement of her thyroid for which treatment was prescribed. The plaintiff returned to the clinic in April 1958. She stated that her backache had improved. She was advised to continue the thyroid treatment indefinitely. She was last seen by the clinic in January 1959. The report states that it was felt

that her general physical status was satisfactory. The thyroid treatment was continued.

Under our statutory definition of extreme cruelty as a ground for divorce the cruelty entails grievous bodily injury or grievous mental suffering. The plaintiff cites this rule stated in Mosher v. Mosher, 16 N.D. 269, 113 N.W. 99, 12 L.R.A.,N.S., 820:

"A continuous course of fault-finding, threats, and other acts, intended to aggravate and annoy the other party to a marriage, though each act is trifling in itself, may cause such a degree of mental suffering as to constitute a ground for divorce on the charge of extreme cruelty."

The evidence in this case does not bring it within this rule. The plaintiff's testimony appears to be greatly exaggerated with respect to the incidents upon which she chiefly relies. Most of it has little corroboration in the testimony of the daughter Maxine. But one incident of violence is mentioned in the record. Plaintiff alone testified that she was pushed down in the corner during the argument that took place when she left the farm in June 1958. The report of the Mayo Clinic clearly shows that her claim of injury to her spine from horseback riding or hard work is unfounded. Her health has undoubtedly been adversely affected by a thyroid condition for some time but there is no evidence from which an inference can be drawn that the defendant is in any way responsible for that condition. There were arguments from time to time over financial matters but most of them were won by the plaintiff and while the defendant may have grumbled somewhat she prevailed. Nowhere does it appear that she was prevented from going to any doctor or dentist of her choice or that the defendant refused to pay the bills. According to her own testimony when the defendant offered to secure a house for the family in Bismarck she refused. Evidence of grievous bodily injury is nonexistent. That of grievous mental suffering is nebulous.

In Schouler, Marriage, Divorce, Separation and Domestic Relations, Sixth Edition, Volume 2, Section 1580, it is said:

"The fact that the husband refused to allow the wife to participate in the conduct of his business, which resulted in violent quarrels and bickerings between them, is not of itself a cause for divorce for extreme cruelty. Neither incompatibility of temper nor ordinary misunderstandings and bickerings which are characteristic of the marriage relation in a considerable percentage of cases constitute extreme cruelty."

In Swanson v. Swanson, 75 N.D. 332, 28 N.W.2d 73, 75, this court said:

"Whether the acts of the plaintiff have inflicted grievous mental suffering upon the defendant is a question of fact to be determined from all of the circumstances of the case. Mahnken v. Mahnken, 9 N.D. 188, 82 N.W. 870; Rindlaub v. Rindlaub, 19 N.D. 352, 125 N.W. 479. In this case there is merely evidence of acts which it is now said caused grievous mental suffering. There is no direct evidence that the acts did cause such suffering. Facts, of course, may justify inferences and certainly it is a legitimate inference in this case that the plaintiff's acts did cause the defendant annoyance and humiliation, but whether they caused grievous mental suffering is another question. Grievous means 'severe or intense.' Webster's International Dictionary. In this connection we think it is pertinent to point out that our statutes draw a distinction between extreme cruelty and cruelty. Extreme cruelty is made an immediate ground for divorce while cruelty is made an element of constructive desertion. Where the parties to a marriage sep-

arate because of the cruelty of one or the other, the separation must continue a year before the acts ripen into grounds for divorce. R.C.1943, §§ 14–0506, 14–0509."

In Hodous v. Hodous, 76 N.D. 387, 36 N.W.2d 552, we said that mental anguish is the equivalent of grievous mental suffering.

Application of the rule which we have quoted from Mosher v. Mosher, 16 N.D. 269, 113 N.W. 99, 12 L.R.A.,N.S., 820, was urged in Savre v. Savre, 77 N.D. 242, 42 N.W.2d 642, 646. What we said there regarding the rule applies here:

> "The rule thus stated does not apply to the facts in this case. It does not appear that the defendant intended to aggravate and annoy the plaintiff, or for that matter, that she intended to annoy him. The annoyances, if such they may be called, arose from differences in viewpoint and personality, and these in turn gave rise to irritations and disagreements. They no doubt resulted in mental discomfort but to say that they amounted to grievous mental suffering and extreme cruelty is to extend the divorce statute beyond its intent."

It is interesting to note that the trial court suggested to the plaintiff's counsel that he might ascertain if it were possible to amend the complaint to set forth a prayer for separate maintenance instead of absolute divorce. Her counsel reported that she would not change the complaint to ask for a separation and insisted on leaving it as it was, praying for a divorce.

■■ The plaintiff points out the long-established principle of this court that in reviewing a case that has been tried to the court without a jury we give appreciable weight to the findings of fact of the trial court. Many of our cases supporting this principle are cited in Pauly v. Haas, N.D., 84 N.W.2d 302. We do not hesitate to apply that principle but we never apply it to

relieve us from performing our statutory duty to "try anew the questions of fact * * * in the entire case." Section 28–2732, NDRC 1943. See Belt v. Belt, 75 N.D. 723, 32 N.W.2d 674; Gust v. Wilson, 79 N.D. 865, 60 N.W.2d 202, 38 A.L.R.2d 1371.

■ Our review of the facts leads us to the conclusion that under the laws of this state the plaintiff is not entitled to a divorce on the ground of extreme cruelty. The judgment appealed from is therefore reversed.

SATHRE, C. J., and BURKE, TEIGEN, and STRUTZ, JJ., concur.